Philip **HENNINGSEN**, individually and on behalf of all others similarly situated, Plaintiff,

v.

The **ADT CORPORATION**, et al., Defendants.

**Saratoga Advantage Trust Large Capitalization Value Portfolio**, individually and on behalf of all others similarly situated, Plaintiff,

v.

The **ADT Corporation**, et al., Defendants.

Case No. 14–80566–CIV–DIMITROULEAS, Case No. 14–80862–CIV–DIMITROULEAS

United States District Court, S.D. Florida.

Signed June 3, 2015

Filed June 4, 2015

Christopher F. Moriarty, William S. Norton, Motley Rice, LLC, Mount Pleasant, SC, Jack Reise, Robbins Geller Rudman & Dowd LLP, Boca Raton, FL, James Paul Gitkin, Salpeter Gitkin, LLP, Fort Lauderdale, FL, John Pritchard Murray, The Murray Law Firm, P.A., Coral Gables, FL, for Plaintiffs.

Alexandra M. Walsh, Paul, Weiss, Rifkind, Wharton & Garrison, LLP, Washington, DC, Daniel J. Kramer, Robert N. Kravitz, Paul Weiss Rifkind Wharton & Garrison, Daniel A. Richards, J. Wesley Earnhardt, Rory A. Leraris, Sandra C. Goldstein, Cravath, Swaine & Moore, LLP, Jessica A. Fitts, Michael A. Asaro, Nancy Chung, Akin, Gump, Strauss, Hauer & Feld, LLP, New York, NY, Daniel A. Mason, Paul, Weiss, Rifkind, Wharton & Gar-

rison, LLP, Wilmington, DE, Louise McAlpin, Tracy Ann Nichols, Brittany Leanne Brown, Holland and Knight LLP, Abigail M. Lyle, Samuel Alberto Danon, Hunton & Williams, Brian Paul Miller, Samantha J. Kavanaugh, Lorayne Perez, Akerman LLP, Miami, FL, for Defendants.

## ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS

WILLIAM P. DIMITROULEAS, United States District Judge

THIS CAUSE is before the Court upon the Defendants The ADT Corporation ("ADT" or the "Company") and Naren Gursahaney's Motion to Dismiss the Consolidated Complaint, (DE 66); Defendant Kathryn Mikells' Motion to Dismiss the Consolidated Complaint (DE 68); and Defendants Keith Meister and Corvex Management LP's (collectively the "Corvex Defendants") Motion to Dismiss the Consolidated Complaint (DE 67), all filed on September 25, 2014. The Court has considered the Motions, Lead Plaintiffs' Responses (DE 78, 79, & 80), and Defendants' Replies (DE 86, 87 & 88), as well as the parties' oral arguments, which were heard by the Court at hearings held on February 27, 2015, March 20, 2015, and April 10, 2015 (DE 101, 105 & 108), and is otherwise fully advised in the premises.

## I. BACKGROUND

### A. Overview

This is a federal securities action against Defendants ADT, Gursahaney, Mikells, Corvex and Meister, for alleged violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). Plaintiffs allege that during the Class Period Defendants engaged in a fraudulent scheme to artificially inflate ADT's stock price by falsely (i) misrepresenting and failing to disclose the effect of competition on customer attrition, customer additions, and costs, (ii) misrepresenting and failing to disclose the impact of customer service problems, unscrupulous sales practices, and increased customer screening, (iii) misrepresenting and failing to disclose ADT's alleged plans to increase targeted leverage ratio, and (iv) failing to disclose, and engaging in a capital restructuring plan with, an entrenchment motive. (DE 60, Am. Compl. (hereinafter the "Complaint").)

### B. The Parties

Plaintiffs were appointed to serve as Lead Plaintiffs in this action by Order of this Court dated July 14, 2014. (DE 51.) Plaintiffs purchased or otherwise acquired ADT common stock during the Class Period. (DE 60, Am. Compl. ¶ 13.)

Defendant ADT is a leading provider of electronic security and related monitoring services to homes and businesses in the United States and Canada. (*Id.* ¶ 14.)

Defendant Gursahaney has been Chief Executive Officer ("CEO"), President, and a Director of ADT since the Company was spun-off from Tyco on September 28, 2012. (*Id.* ¶ 15.)

Defendant Mikells served as ADT's CFO from May 2012 to May 2, 2013. (*Id.* ¶ 16.) She voluntarily resigned on May 2, 2013. (*Id.* ¶ 76.)

Defendant Corvex is an investment firm that between October 2012 and November 2013 owned approximately 5% of ADT's outstanding common stock. (*Id.* ¶ 19.) Defendant Meister is the founder, managing director, and principal partner of Cor-

vex. (*Id.* ¶ 20.) On December 17, 2012, Meister was appointed to ADT's Board of Directors. (*Id.* ¶ 90.) Meister also served as a member of ADT's Audit Committee. (*Id.* ¶ 20.) On November 24, 2013, pursuant to an agreement that was publicly disclosed, ADT repurchased the shares of Corvex at the most recent closing price of ADT shares as of the end of the prior trading day and Meister resigned from the Board. (*Id.* ¶ 225.)

### C. The Class Period

The Class Period begins on November 27, 2012 and ends January 19, 2012.

### D. The Stock Repurchase Plan

1. Corvex Publicly Criticizes ADT's Capital Structure and Becomes a Shareholder. ADT Institutes a Capital Repurchase Plan.

On October 24, 2012, Defendant Meister, speaking on behalf of Corvex, made a 50–slide presentation to investors, arguing that ADT was undervalued and should use increased leverage to repurchase 30% of ADT's shares. (*Id.* ¶ 83.) In the presentation, Defendant Meister publicly criticized ADT's conservative approach to debt and referred to ADT's capital structure as "indefensible." (*Id.*) On October 25, 2012, the next day, Defendant Corvex filed a Schedule 13D, announcing it had purchased over 5% of ADT's common stock, and attached to the Schedule 13D the presentation it had given the previous day. (*Id.*) On the same day, ADT issued a press release, filed with the SEC on Form 8–K, acknowledging Corvex's Schedule 13D filing. (*Id.* ¶ 84.) In the press release, ADT acknowledged that it has had "constructive discussions with Defendant Corvex and others to understand their views. ADT is

committed to delivering long-term value to all its shareholders." (*Id.*) On November 26, 2012, Defendant Meister met with certain members of ADT's Board and management and stated that he was interested in joining the ADT Board and conveyed Defendant Corvex's view that "ADT could enhance shareholder value through the incurrence of incremental leverage." (*Id.* ¶ 85.)

In ADT's November 27, 2012 Press Release, ADT announced that the Board had approved a share repurchase program, authorizing ADT to purchase $2 billion of its common stock through November 27, 2015. (*Id.* ¶¶ 86, 114.)

2. The ADT Board Considers Third–Party Presentations that Speculate on the Corvex Defendants' Likely Future Action. Meister Joins the ADT Board.

On December 13, 2012, the ADT Board discussed the "pros and cons of Keith Meister's request to join the ADT Board of Directors" and noted that "if Mr. Meister is not asked to join the Board then Corvex Management will likely make a shareholder proposal to elect Mr. Meister and possibly others as directors of ADT at ADT's 2013 annual meeting of stockholders." (*Id.* ¶ 88.) On December 14, 2012, the ADT Board discussed that "Mr. Gordon request that Mr. Bleisch attempt to negotiate mutually satisfactory standstill and confidentiality agreements with Mr. Meister, Corvex Management and the other Corvex-related parties." (*Id.*)

During the December 13 and 14, 2012 Board meetings, Credit Suisse made a presentation to the ADT Board speculating that if ADT did not agree to Meister's capital structure changes and offer him a Board seat, Corvex would "likely" seek to "[a]dd new outside directors or replace

existing directors" and make an "attack on CEO or [demand] other changes in management." (*Id.* ¶ 89.) Board materials recommended the benefits of negotiating with Defendant Corvex to ensure that all current directors stay on Board. (*Id.*) Further, a Lazard presentation dated December 3, 2012 speculated that the Board would need to "fully or partially implement Corvex's capital structure and capital allocation proposals by increasing leverage to 3x" and that "[a]t least some additional capitulation [might] be required to substantiate a Corvex claim of 'victory' and encourage exit." (*Id.*)

On December 17, 2012, ADT announced that Meister had been appointed to ADT's Board. (*Id.* ¶ 90.) At its January 10, 2013 board meeting, the ADT Board adopted the recommendation of its committee to keep Meister on the Board and appoint him a member of the Audit Committee. (*Id.* ¶ 92.) In the January 28, 2013 Proxy Statement, ADT asked shareholders to vote on Defendant Meister's election as a Director. (*Id.* ¶ 138.)

### 3. ADT Increases its Leverage Ratio to Three Times Debt.

During the July 18 and 19, 2013 Board meetings, ADT board members discussed ADT's capital structure and the share repurchase plan. (*Id.* ¶ 97.) At the meeting, ADT considered a Goldman Sachs presentation that observed the importance of outwardly maintaining confidence in ADT's ability to support increased leverage. (*Id.*) The materials referred to the importance of maintaining the appearance of a strong business model, cash flow and liquidity in order to "execute Meister's demands." (*Id.* (restating a conclusory allegation from the derivative complaint in Case No. 14–80570–WPD).) Further, it is alleged that the Individual Defendants were made aware that the increase in leverage would result in the likely loss of management credibility in the eyes of rating agencies and debt holders. (*Id.* ¶ 97.)

In the July 31, 2013 Conference Call, Defendant Gursahaney revealed, for the first time, that ADT was increasing its target leverage ratio to 3 times debt to EBITDA to fund ADT's capital allocation restructuring including share repurchases. (*Id.* ¶ 185.) Defendant Gursahaney stated that "[w]e expect to use proceeds from incremental leverage to pursue a flexible, balanced capital allocation plan on an ongoing basis, including investing in organic growth, completing acquisitions, and returning capital to shareholders in the form of dividends and share buybacks." (*Id.*)

### 4. Corvex Requests Accelerated Timeframe.

In September 2013, the Individual Defendants received from Goldman Sachs and Centerview Partners a "Situation Update" concerning Corvex. According to the update, in late August, Corvex proposed an accelerated timeframe for increasing net leverage to 3.0x by the end of FY2014 and using the majority of debt proceeds to repurchase shares, instead of management's July plans to increase leverage to 3.0x by Q12015 and to allocate capital more heavily to mergers and acquisitions. (*Id.* ¶ 101.) The materials indicated that adoption of the Corvex capital allocation timetable was a condition to Meister's exit from the board, that Corvex's participation in a large share repurchase would be dependent on price, and that if the leverage timeframe was not adopted, Corvex would present a Public LBO and run a competing slate of directors. (*Id.* ¶ 102.)

In the September 24, 2013 Press Release, ADT announced the pricing of $1

billion in debt securities that would raise capital to pay down debt associated with prior and new share repurchases. (*Id.* ¶ 198.) In November 20, 2013 Press Release, Defendants provided an update on its share repurchase plan, announcing that, since its inception, ADT has repurchased 35.5 million shares for $1.6 billion, that an additional $400 million worth of shares would be repurchased from JPMorgan Chase on an accelerated basis, and that the Board had authorized another $1.0 billion in share repurchases. (*Id.* ¶ 204.)

### 5. Corvex Sells Stock and Meister Resigns.

In the November 25, 2013 Press Release, ADT announced its agreement with Corvex to repurchase the vast majority of Corvex's ADT common stock at the current market price ($44.01 per share), and that Defendant Meister had resigned from the Board. (*Id.* ¶ 225.)

### E. Operational Challenges

#### 1. Confidential Witness Accounts

##### a. CW1

CW1 was the Director of Product Management in ADT's headquarters from December 2005 to April 2014. (*Id.* at 15 n.5.) He reported to the Vice President of Product Solutions, who in turn reported to the Chief Innovation Officer. (*Id.*) He primarily worked on Pulse[1] and was the team leader for all of the various teams that were involved with developing Pulse. (*Id.*) He stated that Comcast and AT & T were formidable competitors because they had significant resources and a growing concern of ADT, particularly in 2013. (*Id.*

¶ 41.) He commented that attrition was one of the biggest issues emphasized by ADT's executive leadership and was discussed during the period from April 2013 to April 2014. (*Id.* ¶ 67.) He said that reducing the attrition rate was one of the key considerations when considering new projects. (*Id.*) He recalled that attrition and competition were topics discussed at the Company's town hall meetings, which Defendant Gursahaney attended. (*Id.*)

##### b. CW2

CW2 was a Senior Financial Analyst at ADT in an unspecified location from October 2012 until Spring 2014. (*Id.* at 15 n.6.) He was responsible for sales reporting to determine the commissions to be paid to sales personnel, and sales-related expense reporting. (*Id.*) He stated that in mid-2013, competition was having a real impact on ADT, and that in any market where it had competition ADT was "doing horrible." (*Id.* ¶ 42.) He said that in mid-2013 Defendant Gursahaney was obsessed with competition, but there is no indication in the Complaint as to the basis for this conclusion about Defendant Gursahaney. (*Id.*)

##### c. CW3

CW3 was a Residential Sales Representative at ADT in West Palm Beach, Florida from 2008 to February 2014. (*Id.* at 16 n.7.) During his last year, the employee was cross-trained to work in a new department focused on promoting existing clients to ADT Pulse. (*Id.*) He stated that competition was a "rising concern" at ADT during 2013; ADT went into a "state of panic" in early 2013; and ADT started to hold special meetings, led by a District

---

**1.** Pulse involves interactive technologies that allow ADT customers to remotely monitor and manage their homes and small businesses through electronic security systems. (*Id.* ¶ 34.)

Sales Manager, to discuss with sales representatives a game plan to deal with competition. (*Id.* ¶ 44.) It is unclear whether these special meetings were a company-wide initiative.

CW3 stated that the sales team was concerned with Comcast and AT & T because their price points were lower than those of ADT, and it was becoming increasingly challenging to convince customers to buy ADT's services rather than a competitor's. (*Id.*) He stated that ADT increasingly lost more customers to competitors, but did not quantify the number of lost customers. (*Id.* ¶ 43.)

CW3 stated that there were "significant problems" with ADT's authorized dealers but failed to allege the temporal or geographical scope of the problems. (*Id.* ¶ 54.) He said that the work of an unspecified number of dealers was "often shoddy," which resulted in a loss of "many customers," and they often sold to customers outdated or unauthorized equipment, which had to be replaced by service technicians. (*Id.* ¶ 55.) He said that an unspecified number of customers called with complaints about dealers on a "regular basis." (*Id.* ¶ 56.) He stated that sales representative would raise problems about the dealers at sales meetings, which were attended by a District Sales Manager and sometimes the Vice President of Sales for Florida, but were told the dealers were not going away. (*Id.*) He reported that, according to a Company newsletter, in mid–2013 Defendant Gursahaney took the top authorized dealer representatives on a vacation and said they were the backbone of ADT. (*Id.*)

CW3 also stated that an unspecified number of customers complained that their homes were not being monitored because of faulty equipment. (*Id.* ¶ 60.) He

explained that near of the end of 2013, ADT created a Customer Loyalty Desk, which was dedicated to resolving customer complaints, although he thought the department was "a joke." (*Id.* ¶ 62.) He observed that the level of customer care consistently decreased year after year, and customer service became worse after ADT and Tyco separated. (*Id.* ¶ 63.) The time period between the end of 2012 and when he left in early 2014 was the apex of the worst problems at ADT, he alleged. (*Id.*)

#### d. CW4

CW4 was a Credit Balance Analyst at ADT in an unspecified location from December 2010 to August 2013. (*Id.* at 16 n.8.) He worked in the Shared Account Services Department and reviewed credits on customer accounts and determined whether to refund or retain the balance. (*Id.*) He said that new competition was definitely a concern at ADT, especially Comcast's new system that was similar to ADT Pulse but less expensive. (*Id.* ¶ 45.) During the last year of his employment, i.e. August 2012 to 2013, it was "especially common" that an unspecified number of customers canceled their accounts to move to a competitor. (*Id.*) He said it was also "common" that an unspecified number of customers canceled because they found out that their residence was not actually being monitored due to ADT mistakes. (*Id.* ¶ 60) CW4 complained that ADT spent money on retention credits as an enticement to keep customers who called to cancel their accounts, but the credits rarely resulted in customers staying. (*Id.* ¶ 70.)

#### e. CW5

CW5 was a Cash Application Specialist in ADT's Billing Department located in Aurora Colorado from 2009 to March 2014. (*Id.* at 17 n.9.) He worked on 80–150

accounts per day and determined whether to retain or refund funds to the customer. (*Id.*) In 2013, "many customers" were switching over to competitors, causing a "bump" in the number of deactivated accounts. (*Id.* ¶ 45.)

More generally, CW5 stated that ADT was "constantly" receiving requests from customers to cancel and saw deactivated accounts "all the time" from March 2013 to March 2014. (*Id.* ¶ 64.) ADT was losing customers "like crazy" in 2013. (*Id.*) He said that in 2013, many Field Support Center employees were sent home early or laid off because of the lack of new accounts. (*Id.*)

### f. CW6

CW6 was a Customer Service Representative with ADT for a little over one year, from July 2012 to November 2013, at a call center in Irving, Texas. (*Id.* at 17 n.10.) He worked in the Customer Service Department, which employed 300–400 people. (*Id.*) He handled 65–70 calls per day from residential and small business customers, among other duties. (*Id.*) He said that he "regularly" received deactivation requests because competitors were offering a lower price. (*Id.* ¶ 45.)

CW6 said that customers "often" complained about sales people, saying they gave the customer unfulfilled promises of lower costs or free equipment. (*Id.* ¶ 57.) When CW6 or his colleagues tried to reach the sales people, the sales people rarely returned their calls. (*Id.*) He also said that customers complained because they were charged twice. (*Id.* ¶ 59.) CW6 also stated that salespeople did not generally tell customers that a permit was needed, which became an issue when the alarm was set off and the police refused to come. (*Id.* ¶ 61.)

### g. CW7

CW7 was a Senior Analyst for Internal Controls and Compliance, who worked for Tyco and then later ADT at headquarters from October 2012 until April 2014. (*Id.* at 21 n.17.) He said that ADT partnered with dealers that did not require a background check or permitted a lower credit score if the dealer had a large enough customer base. (*Id.* ¶ 53.)

### h. CW8

CW8 was a Customer Service Unit Manager employed with ADT from March 2010 to January 2014. (*Id.* at 21 n.18.) He oversaw the entire operations of a call center in Irving, Texas, comprised of about 400 agents who monitored the alarm systems. (*Id.*) He said that ADT's dealers were a "constant" issue because they would make false promises and then evade customer calls. (*Id.* ¶ 54.)

### 2. Internal Documents

#### a. March 13 and 14, 2013 Board Meetings

At its meetings on "March 13 and 14, 2013," "[t]he Board ... evaluated ADT's competitive environment, noting that '[c]onsumers increasingly have more options—not only from competitors that are positioning themselves directly against ADT, but also from new formidable entrants launching in the space.'" (*Id.* ¶ 47.) Moreover, "ADT was also facing competitive pressures that inhibited dealer marketing and prospecting efficiency." (*Id.*) The Board, which included Defendants Gursahaney and Meister, "discussed 'changes in the market environment, including ... increased competitor advertising that [was] reducing ADT's share of voice in overall marketing by electronic security companies.'" (*Id.*)

In addition, the Board received a second quarter 2013 "Business Update," which also revealed: "(1) an increase in attrition, with Q2'13 T12M at 13.9%, 20 bps higher than plan [sic], driven by relocations and nonpayment; (2) Pulse take rates and competitive environment driving subscriber acquisition costs up; (3) *continued pressure on lead generation (Direct) and Dealer softness impacting gross adds and recurring revenue*; and (4) recurring revenue shortfall putting pressure on margin rates." (*Id.* ¶ 74 (emphasis in original).)

The "March 13, 2013 Board meeting minutes" revealed that there was an "increase in [subscriber acquisition costs]" due to the Company's Pulse "take rates," "promotions and discounting" and noted that " 'pressure on the recurring revenue margin is the biggest issue for the quarter ... [and] the Company continues to see overall pressure on attrition.' " (*Id.* ¶ 75.)

b. May 9, 2013 Board Meeting

At the Board meeting on May 9, 2013, which was attended by all directors, including Defendant Gursahaney, "[t]he 'competitive market and attrition continued to be a focus of the Board's discussions.' " (*Id.* ¶ 77.)

c. June 15, 2013 E-mail

On June 15, 2013, "Defendant Gursahaney sent an email to certain of [ADT's officers and directors].... In the email he noted that the Company had closed the books on May, but 'thought it might be useful to provide [ ] a quarter to date update on [ADT's] financial performance.' Defendant Gursahaney stated that '[t]hrough two months, we are slightly ($1M) behind our revenue forecast as unit production is below forecast and attrition is continuing to run high.... As we look to the rest of the quarter and year, *we are anticipating continued pressure on gross adds and attrition*.' " (*Id.* ¶ 78) (emphasis in original.)

d. July 12, 2013 E-mail

On July 12, 2013, in advance of the release of the Company's third quarter 2013 results, Defendant Gursahaney sent an email to certain of ADT's officers and directors. (*Id.* ¶ 79.) This email "warn[ed] that there were 'three primary gaps' in ADT's financials, of which he wanted to 'make you aware of in advance of your review of the materials.' " (*Id.*) The "gaps" included the following:

In FY14, we will be implementing an enhanced customer credit screening process to help reduce non-pay disconnects. Based on our pilots, we expect this to impact our gross adds in our direct sales channel by 8%. Needless to say, we understand we need to offset more of this than is currently reflected in the model and are working to do so. We also need to make sure our attrition rate reflects the benefit of this screening, however much of the benefit will be realized after FY14. We are confident this is the right thing for the business to do and we understand we need to find offsets to the gross adds shortfall this creates,

Also in FY14, our SSFCF [steady-state free cash flow] is about $20M below where I believe we should be, even after considering our increase in interest payments....

Finally, in the out years (FY17 & FY18) the investments required to support the growth programs are yet to be defined in enough detail to provide meaningful estimates at the project level. For our modeling purposes, we have assumed a level of capax that is consistent with this year.

(*Id.*)

e. July 18 and 19, 2013 Board Meeting

On July 18 and 19, 2013, the Board held meetings [attended by Defendants Gurs-

ahaney and Meister, among others], during which it discussed ADT's capital structure, strategic plan, share repurchase plan, and business risks facing the Company, *including increased competition in the marketplace, and an "attrition trend [that] continues to grow,"* offsetting benefits from planned initiatives. (*Id.* ¶ 80 (emphasis in original).)

### f. October 20, 2013 E-mail

Thereafter, "[o]n October 20, 2013, Defendant Gursahaney sent an email to certain [officers and directors] regarding the preliminary [fourth quarter 2013 and fiscal year 2013] results, noting that ADT had come in about $15 million below its FCF [free cash flow] forecast and about $25 million below its SSFCF [steady-state free cash flow] estimate." (*Id.* ¶ 81.) "The primary drivers of the shortfall were *attrition,* higher Pulse take rates and Pulse upgrades *that increased subscriber acquisition costs* and higher capital expenses as the Company accelerated some IT spending associated with its new Pulse product platform." (*Id.*)

### F. The Alleged Misstatements and Omissions

#### 1. First Fiscal Quarter 2013

##### a. Repurchase Plan

In ADT's November 27, 2012 Press Release, ADT disclosed that the Board had approved a share repurchase program, authorizing ADT to purchase $2 billion of its common stock through November 27, 2015. (*Id.* ¶ 114.) The Form 10–K announced that its "board of directors approved $2 billion of share repurchases over the next three years." (*Id.* ¶ 122.) In the November 27, 2012 Conference Call, Defendant Gursahaney further commented that the share repurchase program was "a thoughtful capital policy that is based on our overall business strategy and the opportunities and risks we see for our business." (*Id.* ¶ 126.) Defendant Gursahaney commented on ADT's "commitment to maintain an investment grade rating" and targeted leverage ratio of "about 2 times." (*Id.*) Defendant Gursahaney stated that he did not see a major departure from what was contemplated prior to the spin-off. (*Id.*) Defendant Mikells further stated that "in looking at our leverage target, we are certainly confident that is going to enable us to maintain investment and investment grade rating. And ultimately that something were [sic] going to continue to manage to." (*Id.* ¶ 127.)

##### b. Operations

In the November 27, 2012 Press Release, ADT announced its fourth quarter and total fiscal year 2012 financial results. Defendant Gursahaney boasted of solid recurring revenue growth and the Company's strong competitive position. (*Id.* ¶ 113.)

In the 2012 Form 10–K, ADT highlighted its "proven track record of successfully balancing" its key business drivers and discussed its customer service, commenting on its ability to use its recurring revenue "to more effectively deliver exceptional service to our customers." (*Id.* ¶ 115.) The Form 10–K stated that ADT's emphasis "on customer value drives customer satisfaction and tenure, decreasing customer attrition and improving [its] profitability." (*Id.* ¶ 116.) The Form 10–K also stated that ADT "maintain[s] a service culture aimed at 'Creating Customers for Life.'" (*Id.* ¶ 117.) ADT stated that it "maintain[s] consistently high levels of customer satisfaction." (*Id.* ¶ 121.)

Regarding ADT's customer selection process, the Form 10–K stated that ADT

has "[a] structured customer acquisition process that is designed to produce customers with attractive characteristics, including strong credit scores ..., which we believe results in long average customer tenure." (*Id.* ¶ 117–18.)

Regarding ADT's competition, the Form 10–K commented as follows:

Competition is often based primarily on price in relation to value of the solutions and service. Rather than compete purely on price, we emphasize the quality of our electronic security and home/business automation services, the reputation of our industry leading brands and our knowledge of customer needs, which together allow us to deliver an outstanding customer experience. In addition, we are increasingly offering added features and functionality, such as those in our ADT Pulse interactive services offering, which provide new services and capabilities that serve to further differentiate our offering and support a pricing premium.

As we move into the interactive services and home automation space, we face new competition from competitors such as cable and telecommunications companies. However, we believe our robust field sales force, including our nationwide team of in-home sales consultants, our solid reputation for and expertise in providing reliable security and monitoring services through our in-house network of fully redundant monitoring centers, our reliable product solutions and our highly skilled installation and service organization position us well to compete with these new competitors.

(*Id.* ¶ 119.)

Likewise, in the November 27, 2012 Conference Call, Defendant Gursahaney observed that there were some new competitors in addition to ADT's traditional competitors with strong capabilities and considerable scale and capitalization but stated that "we feel very good about our positioning capabilities compares to these new competitors." (*Id.* ¶ 125.) Defendant Gursahaney stated that he "d[id]n't see a significant difference in our performance in those markets versus other markets." (*Id.* ¶ 129.)

Regarding ADT's sales force, the Form 10–K commented as follows:

We train and monitor each dealer to help ensure the dealer's financial stability, use of sound and ethical business practices and delivery of reliable and consistent high-quality sales and installation methods. Authorized dealers are required to adhere to the same high quality standards for sales and installation as company-owned field offices.

(*Id.* ¶ 120.)

Regarding growth in subscriber acquisition costs, Defendant Gursahaney stated at the Conference Call that growth was "heavily" and "primarily" driven by Pulse. (*Id.* ¶ 130.)

Regarding attrition, the Form 10–k announced increased attrition, attributing it to price escalations without further explanation. (*Id.* ¶ 123.) On the November 27, 2012 Conference Call, Defendant Mikells stated that ADT's implementation of programs to help customer retention would "help to mitigate otherwise pressure against attrition." (*Id.* ¶ 128.) Likewise, Defendant Gursahaney stated:

[W]e have got a very robust set of programs that we're implementing and continuing to drive to try and mitigate that [attrition] across all areas.... As part of our leadership meeting a couple

weeks ago, we really focused 80% of our leadership meeting on how we become a more customer obsessed organization and some investments that we think we can make there. So, again, I think there are some natural headwinds but we're working hard to make sure we minimize that and get to the extent possible, try and offset it.

(*Id.* ¶ 128.)

### 2. Second Fiscal Quarter 2013

#### a. Repurchase Plan

In the January 14, 2013 Press Release, ADT announced that it had priced a private offering of 4.125% Senior Notes due 2023 worth $700 million. (*Id.* ¶ 137.) In the January 30, 2013 Press Release, ADT provided an update on its stock repurchase plan, stating that ADT had repurchased over 2 million shares for a total of $100 million, and had entered into an accelerated share repurchase agreement with Credit Suisse International, under which it would repurchase approximately $600 million of its common stock using the funds from its recently concluded debt offering. (*Id.* ¶ 141.) The Form 10–Q for the first quarter of 2013 provided information regarding certain of the shares repurchased and debt issued in connection with the $2 billion repurchase plan. (*Id.* ¶ 143.)

During the January 30, 2013 Conference Call, Defendant Gursahaney stated that the repurchase was a "very effective way of using our additional leverage to enhance shareholder returns." (*Id.* ¶ 141.) Defendant Mikells stated, in response to a question about the reason ADT was not buying back more shares, "we are executing exactly what we intended and said we were going to execute and I think we are fairly far along in the program for the year and

that is very consistent with the overall capital structure and capital allocation that we talked about at the end of November." (*Id.* ¶ 150.)

In the March 21, 2013 Amendment No. 1 to Form S–4, ADT disclosed an exchange offer of up to $2.5 billion principal of its outstanding unregistered debt securities for new registered debt securities. (*Id.* ¶ 153.)

#### b. Operations

In the January 30, 2013 Press Release, ADT announced its first quarter results and reaffirmed its guidance for fiscal 2013, originally announced in November 2012.

In the 2013 Form 10–Q First Quarter, ADT stated that it focuses on "Creating Customers for Life by maintaining consistently high levels of customer satisfaction, which increases customer tenure and improves profitability." (*Id.* ¶ 142.) ADT stated that it focuses on "high quality service and our disciplined customer selection process in order to limit customer attrition." (*Id.*)

Regarding attrition, in the Form 10–Q, the Company announced flat attrition and lower additions, blaming it on Hurricane Sandy and lower deal channel production. (*Id.* ¶ 144.) In the January 30, 2013 Conference Call, Defendant Gursahaney stated that ADT saw some stabilization in attrition and that loss to competition accounts for 10% of disconnects. (*Id.* ¶¶ 146–47.) In addition, Defendant Gursahaney observed negative trends in gross customer additions, lead generation, and subscriber acquisition costs, but failed to address the impact of competition on the trends. (*Id.* ¶ 148.)

Regarding competition, Defendant Gursahaney stated that ADT was "not seeing

any significant change, but clearly it is a dynamic environment. We have got new competition coming in and we are going to continue to monitor it very closely." (*Id.* ¶ 150.) When an analyst mentioned that previously ADT has cited competition as the reason for not buying back more shares and asked what they were seeing as far as competition, Defendant Mikells stated as follows:

> So from my perspective, we are executing exactly what we intended and said we were going to execute and I think we are fairly far along in the program for the year and that is very consistent with the overall capital structure and capital allocation that we talked about at the end of November.... [T]he competitive environment really hasn't changed quarter-to-quarter. We are seeing the same level of overall competition.... [T]he metrics are holding up very well.

(*Id.* ¶ 150.)

### 3. Third Fiscal Quarter 2013

#### a. Repurchase Plan

In the April 1, 2013 Form 424B3 prospectus supplement, ADT disclosed an exchange offer of up to $2.5 billion principal of its outstanding unregistered debt securities for new registered debt securities. (*Id.* ¶ 156.) In the April 12, 2013 Press Release, ADT announced that it had completed its accelerated stock repurchase program resulting in the repurchase of 12.6 million shares at a cost of $600 million. (*Id.* ¶ 157.) In the April 12, 2013 Form S–4 and the April 18, 2013 Form 424B3 prospectus supplement, ADT issued statements regarding an exchange offer of $700 million worth of unregistered 4.125% Senior Notes due 2023 for new registered notes. (¶¶ 158–59.) The May 1, 2013

Press Release provided an update on the purchases under the stock repurchase plan and stated "[c]apital management continues to be a major focus for us." (¶¶ 95, 163.) In the Form 10–Q, ADT provided information regarding certain of the shares repurchased and debt issued in connection with the $2 billion share repurchase plan announced in November 2012. (*Id.* ¶ 165.) In the May 1, 2013 Conference Call, regarding the funding of the share repurchases, Defendant Gursahaney stated the Company has a "resilient business model, which enables us to invest in growth and consistently return significant capital to shareholders" and further commented "I think we have liquidity at this point and we are at our target leverage. So again I think we are sticking to what we laid out back in November." (*Id.* ¶ 173.)

#### b. Operations

In the May 1, 2013 Press Release, ADT announced its financial results for the second quarter of fiscal year 2013. In the May 1, 2013 Form 10–Q Second Quarter, ADT reported "consistently high levels of customer satisfaction, which increases customer tenure and improves profitability." (*Id.* ¶ 164.) The Company's Business Overview stated that it focused on "grow[ing] [its] account base in a cost effective manner." (*Id.*) ADT added that it focuses on delivering "high quality services" and its "disciplined customer selection process" in order to limit customer attrition." (*Id.* ¶ 166.)

During the May 1, 2013 Conference Call, Defendants stated "attrition has stabilized over the last two quarters and was essentially flat at 13.9% versus last quarter." (*Id.* ¶ 168.) Defendants predicted that ADT would "come in at the high end of our full-year EBITDA margin guidance." (*Id.* ¶ 169.)

Regarding costs, Defendant Gursahaney stated that "[w]ith our needed customer service investments in place, we will be focused on cost control...." (*Id.* ¶ 170.)

Regarding competition and further discussing attrition, Defendant Gursahaney stated "[n]ew entry competitors continue to have little impact on attrition and in fact, we think the level of concern that has been expressed by some over the past few weeks is overblown.... [W]e attribute less than 10% of our total customer disconnects to lost competition".... We continue to closely monitor the impact ..., but to date nothing has really changed." (*Id.* ¶ 171.)

### 4. Fourth Fiscal Quarter 2013

#### a. Repurchase Plan

In the July 31, 2013 Conference Call, Defendant Gursahaney revealed, for the first time, that ADT was increasing its target leverage ratio to 3 times debt to EBITDA to fund ADT's capital allocation restructuring including share repurchases. (*Id.* ¶ 185.) Defendant Gursahaney stated that "[w]e expect to use proceeds from incremental leverage to pursue a flexible, balanced capital allocation plan on an ongoing basis, including investing in organic growth, completing acquisitions, and returning capital to shareholders in the form of dividends and share buybacks." (*Id.*) When asked for the reason for the increase, Defendant Gursahaney stated that the extra debt would be "optimal" for the ADT's growth and acquisition strategy, and deferred any other discussion until the Company's Investor Day, scheduled in the fall of 2013. (*Id.* ¶ 186.)

In the July 31, 2013 Press Release, ADT provided an update on its share repurchases program, announcing the buyback of a total of 9.3 million shares in the prior quarter, and stating, that since inception, ADT had repurchased 25.3 million shares for $1.15 billion.

#### b. Operations

In the July 31, 2013 Press Release, ADT announced financial results for the third quarter. Defendant Gursahaney reported "solid execution on our growth and cost control initiatives." (*Id.* ¶ 178.) In the July 31, 2013 Form 10–Q Third Quarter, ADT reaffirmed its "Business Overview," including its focus on creating "Customers for Life." (*Id.* ¶ 181.)

Regarding competition, in the July 31, 2013 Conference Call, Defendant Gursahaney stated "I would say loss to competition, there hasn't been a significant change there," and he further stated "I think we are able to continue to get prices although we are going to continue to watch that [competition] closely." (*Id.* ¶ 187.)

Regarding subscriber acquisition costs in ADT's direct sales channel, Defendant Gursahaney stated that SAC was up 12.8% on a trailing 12–month basis versus last year "reflecting ongoing success in selling Pulse to new .... customers, as well as costs related to Pulse upgrade for existing customers" and was expected to continue to grow due to Pulse. (*Id.* ¶ 194; DE 66–1 at 267.) Later, when asked about pressure on subscriber acquisition costs with the emergence of new competitors, Defendant Gursahaney acknowledged that "SAC has gone up" but then stated "most of our SAC increase is the result of the Pulse take rates as well as the Pulse upgrades." (*Id.* ¶ 189.)

Regarding attrition, Defendant Gursahaney commented on the "enhanced screening of prospects aimed at reducing nonparty attrition. These efforts in addition

to ongoing investments in our loyalty desk and the proactive upgrading of customers to Pulse should continue to benefit the controllable elements of attrition." (*Id.* ¶ 191.)

### 5. First Fiscal Quarter 2014

#### a. Repurchase Plan

On November 20, 2013, ADT issued a press release that provided an update on the repurchase plan. (*See* ¶ 204.) Defendant Gursahaney stated that he viewed the repurchase of Corvex's shares as "a good business decision for us being a buyer in the market." (*Id.* ¶ 232.) In the November 20, 2013 Form S–3, ADT made statements regarding the registration of certain debt securities, common stock, etc. (*Id.* ¶ 224.) In the December 2, 2013 Form 8–K, ADT confirmed its repurchase of shares from Corvex. (*Id.* ¶ 228.)

#### b. Operations

On November 20, 2013, ADT issued a press release announcing its fourth quarter 2013 financial results and providing guidance for fiscal year 2014. (*Id.* ¶ 201.) The press release highlighted solid recurring revenue growth and attributed an increase in attrition (13.9% vs. 13.8% the prior quarter) on housing relocations. (*Id.*)

In the 2013 Form 10–K, ADT discussed its "proven track record of successfully balancing" its key business drivers." (*Id.* ¶ 205.) The Form 10–K also stated that ADT "maintain[s] a service culture aimed at 'Creating Customers for Life.'" (*Id.* ¶ 207.) ADT commented on its "disciplined customer selection practices and our delivery of a superior customer experience." (*Id.* ¶ 208.) ADT also stated "[w]e believe our ability to retain customers for longer periods of time is driven in part by

our disciplined customer selection practices and our delivery of a superior customer experience." (*Id.* ¶ 211.)

Regarding competition, like the prior year's Form 10–K, the Form 10–K for fiscal year 2013 stated that while ADT's principal competitors were traditional security companies, it believed it was positioned well to compete with new competition from competitors such as cable and telecommunications companies. (*Id.* ¶ 209.) During the November 20, 2013 Conference Call, after discussing positive financial results, Defendant Gursahaney stated "[w]e continue to see minimal impact on our business performance, specifically attrition, ARPU, and Pulse take rates, resulting from any new competitors attempting to enter our market." (*Id.* ¶ 217.) He attributed the increase in attrition to "relocation disconnects." (*Id.* ¶¶ 219, 221.) Defendant Gursahaney stated that ADT's two-channel (direct and dealer) approach "provides us significant competitive advantage and has allowed us to add more than 1 million new customers each year for the past four years." (*Id.* ¶ 219.)

Regarding dealers, like the prior year's Form 10–K, the Form 10–K for fiscal year 2013 stated that "[a]uthorized dealers are required to adhere to the same high quality standards for sales and installation as company-owned field offices." (*Id.* ¶ 210.)

The Form 10–K provided financial results through September 27, 2013, touting positive results for increased recurring revenue, higher average revenue per customer, and increased gross customer additions over the prior fiscal year (aided in part by an acquisition and offsetting lower dealer channel production). (*Id.* ¶ 213.) ADT announced increased attrition, but attributed it to the housing market and

stated it continued to focus on high quality service and a disciplined customer selection process. (*Id.*)

Finally, according to the Complaint, Defendant Gursahaney stated that per-subscriber acquisition costs in the direct sales channel were up 15.9% versus last year, but blamed it on increased costs in connection with Pulse. (*Id.* ¶ 220.) Defendant Gursahaney stated that "[o]verall, Pulse accounted for the majority of the increase in direct channel SAC." (DE 66–1 at 283.)

During the December 6, 2013 Investor Day Conference, Defendant Gursahaney state "[t]he [market] share story hasn't changed much. Despite some M & A activity and some entrants, ADT is the clear market share leader in this space with six times the scale of our next largest competitor." (*Id.* ¶ 229.) Defendant Gursahaney stated "[i]n the aggregate, the cable market—cable players only have less than 1% of the market today. So it's not a huge impact on the business, and again ADT has some tremendous advantages." (*Id.*) He further stated, "I think as we look forward to 2014, no changes in the marketplace." (*Id.*)

## II. *LEGAL STANDARD*

### A. Section 10(b) Claim

■ To state a claim for securities fraud under section 10(b) of the Act and Rule 10b–5, a plaintiff must allege "six elements: (1) a material misrepresentation or omission; (2) made with scienter; (3) a connection with the purchase or sale of a security; (4) reliance on a misstatement or omission; (5) economic loss; and (6) a causal connection between the material misrepresentation or omission and the loss, commonly called 'loss causation.'" *Instituto De Prevision Militar v. Merrill*

*Lynch,* 546 F.3d 1340, 1352 (11th Cir.2008) (quotation omitted).

■ To survive a motion to dismiss, a claim brought under section 10(b) of the Act or Rule 10b–5 must satisfy (1) the federal notice pleading requirements; (2) the special fraud pleading requirements found in Fed.R.Civ.P. 9(b), *see Ziembà v. Cascade Int'l, Inc.,* 256 F.3d 1194, 1202 (11th Cir.2001); and (3) the additional pleading requirements imposed by the PSLRA, *see Phillips v. Scientific–Atlanta, Inc.,* 374 F.3d 1015, 1016 (11th Cir.2004).

Under the federal notice pleading standards, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R.Civ.P. 8(a)(2). Additionally, Rule 9(b) requires that, for complaints alleging fraud or mistake, "a party must state with particularity the circumstances constituting fraud or mistake," although "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed.R.Civ.P. 9(b).

■ The PSLRA imposes additional heightened pleading requirements. For section 10(b) and Rule 10b–5 claims predicated on allegedly false or misleading statements or omissions, the PSLRA provides that "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). Specifically, the complaint must "plead with particularity facts giving rise to a strong inference that the defendants either intended to defraud investors or were severely reckless when they made

the alleged materially false or incomplete statements." *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1238 (11th Cir.2008) (quotation marks omitted).

### B. Judicial Notice

"In determining whether to grant a Rule 12(b)(6) motion, the Court primarily considers the allegations in the complaint, although matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint, also may be taken into account." *Watson v. Bally Mfg. Corp.*, 844 F.Supp. 1533, 1535 n. 1 (S.D.Fla.1993), *aff'd*, 84 F.3d 438 (11th Cir.1996). When a plaintiff refers to documents in the complaint that are "central to the plaintiff's claims," the Court "may consider the documents part of the pleadings for purposes of Rule 12(b)(6) dismissal, and the defendant's attaching such documents to the motion to dismiss will not require the conversion of the motion into a motion for summary judgment." *Brooks v. Blue Cross & Blue Shield of Florida, Inc.*, 116 F.3d 1364, 1369 (11th Cir.1997). Additionally, the Eleventh Circuit has expressly held that a court may judicially notice relevant documents legally required by, and publicly filed with, the Securities and Exchange Commission ("SEC"). *See Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1276–81 (11th Cir. 1999). As the Eleventh Circuit stated, the "usual rules for considering 12(b)(6) motions are thus bent to permit consideration of an allegedly fraudulent statement in context." *Harris v. Ivax Corp.*, 182 F.3d 799, 802 n. 2 (11th Cir.1999); *Hubbard v. BankAtlantic Bancorp, Inc.*, 625 F.Supp.2d 1267, 1279 (S.D.Fla.2008).

Here, Plaintiffs' Complaint relies on allegedly false statements made in conference calls, press releases, and SEC filings that were legally required and actually filed with the SEC. Because the statements are central to Plaintiffs' claims, the fact that the filings and transcripts are not attached to the Plaintiffs' Complaint is not dispositive. Additionally, the Court notes that Plaintiffs did not object to Defendants' proffer of these documents as exhibits in support of their Motions to Dismiss, and, therefore, the Court will consider the SEC filings, as well as the transcripts of the conference calls and the press releases, to place the allegedly fraudulent statements in context. *See id.*

Plaintiffs have objected, however, to Defendants' reliance on excerpts from the presentations by Lazard (DE 66–1 at 356, i.e. Exhibit 18) and Credit Suisse (DE 86–2, i.e. Exhibit B), which were filed by Defendants in support of their Motion to Dismiss (DE 66). Unlike the SEC filings, press releases, and earning transcripts in the record, which contain allegedly fraudulent statements and are offered to put those statements in context, the presentations proffered by Plaintiffs do not contain any of the allegedly fraudulent statements. Further, Defendants have only offered short excerpts from lengthy presentations. The Court cannot adequately place the allegedly fraudulent statements in context when Defendants themselves have offered only snippets of the full documents. Accordingly, the Court will not rely on the exhibits containing excerpts from the Lazard and Credit Suisse presentations in considering Defendants' Motions to Dismiss.

### III. *DISCUSSION*

#### A. Section 10(b) Claim

##### 1. Material Misrepresentations/Omissions

"A statement is misleading if 'in light of the facts existing at the time of the

statement a reasonable investor, in the exercise of due care, would have been misled by it.'" *FindWhat Investor Group,* 658 F.3d at 1305 (quoting *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 863 (2d Cir.1968)) (alterations and ellipsis omitted). The "appropriate primary inquiry" is "into the meaning of the statement to the reasonable investor and its relationship to truth." *FindWhat Investor Group v. FindWhat.com,* 658 F.3d 1282, 1305 (11th Cir.2011) (quoting *Texas Gulf Sulphur Co.,* 401 F.2d at 862). A statement is misleading only if it "conveyed to the public a false impression." *FindWhat Investor Group,* 658 F.3d at 1305 (citation omitted).

■ Rule 10b–5 prohibits not only literally false statements, but also any omissions of material fact "necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5(b). By voluntarily revealing one fact about its operations, a duty arises for the corporation to disclose such other facts, if any, as are necessary to ensure that what was revealed is not "so incomplete as to mislead." *FindWhat Investor Group,* 658 F.3d at 1305 (internal quotation marks omitted).

■ However, "[r]equiring that disclosures be 'complete and accurate' does not mean that by revealing one fact about a product, one must reveal all others that, too, would be interesting, market-wise." *Id.* (citation, alterations, and ellipsis omitted). A corporation has a duty to neutralize only the "natural and normal implication" of its statements. *Id.*

■ Under Section 10(b) and Rule 10b–5, "a plaintiff must show that the [defendant's] statements were misleading as to a material fact." *Basic Inc. v. Levinson,* 485

U.S. 224, 238, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (emphasis omitted). "The test for materiality in the securities fraud context is 'whether a reasonable man would attach importance to the fact misrepresented or omitted in determining his course of action.'" *See SEC v. Merch. Capital, LLC,* 483 F.3d 747, 766 (11th Cir.2007); *see Next Century Commc'ns Corp. v. Ellis,* 318 F.3d 1023, 1027–28 (11th Cir.2003) (holding that the statement, "as our Company's strong performance continues," to be non-actionable puffery, which, as a matter of law, would not induce reliance).

### a. Repurchase Plan

#### i. Failure to Disclose Motivation

Plaintiffs argue that ADT's statements in public filings and press releases during the Class Period and certain statements made by Defendants Mikells and Gursahaney during conference calls regarding ADT's stock repurchase program were false or misleading. Plaintiffs assert that the statements were false because Defendants failed to disclose the alleged threats made by Defendant Meister on behalf of Corvex that he would oust the Board members from their positions if they did not adopt their stock repurchase plan. Plaintiffs allege that Defendants failed to disclose the "true" motivation of the ADT Board members in proceeding with the stock repurchase plan, which was, allegedly, to remain entrenched in their positions.

Among other statements which Plaintiffs claim are false or misleading, Defendant Gursahaney commented that the share repurchase program was "a thoughtful capital policy that is based on our overall business strategy and the opportunities and risks we see for our business." (Compl. ¶ 126.) Also, in the January 30,

2013 Conference Call, Defendant Gursahaney stated that the repurchase was a "very effective way of using our additional leverage to enhance shareholder returns." (*Id.* ¶ 141.)

■ Even if it were plausible based upon the allegations of the Complaint that the ADT Board harbored a hidden entrenchment motivation when the Board members adopted and implemented the share repurchase program, the law imposes no duty to disclose that motivation. *See Alabama Farm Bureau Mut. Cas. Co. v. Am. Fid. Life Ins. Co.*, 606 F.2d 602, 610 (5th Cir.1979)[2] (holding that Section 10(b) and Rule 10b–5 does not ordinarily require the disclosure of an individual's motives or subjective beliefs in entering into a transaction); *see also Golub v. PPD Corp.*, 576 F.2d 759, 765 (8th Cir.1978) (holding plaintiffs' claim that proxy statement issued by defendants was false because it did not disclose defendants' "true motivation" in selling the assets of the company was not actionable); *Ward v. Succession of Freeman*, 854 F.2d 780, 791–92 (5th Cir.1988) (holding that defendants' failure to disclose an entrenchment motive was not actionable). Section 10(b) and Rule 10b–5 were "designed to impose a duty to disclose and inform rather than to become enmeshed on passing judgments on information elicited." *Golub*, 576 F.2d at 764 (citation omitted). The federal purpose is served when the corporation's public statements fully and fairly set out the relevant facts that a reasonably prudent investor would find material. *Id.* Stockholders are not entitled to have a disclosure of the "true" motivation behind management's decision in entering a transaction, because the motiva-

tion of management is not a material "fact" subject to disclosure. *Id.* at 765.

In *Alabama Farm*, which is binding in this circuit, the plaintiffs brought a derivative action against American Fidelity ("AMFI") and five of its directors to recover for alleged violations of Rule 10b–5 and other provisions. 606 F.2d at 605–06. The plaintiffs asserted that a stock repurchase program instituted by defendants was a manipulative device carried out to boost artificially the price of the corporation's stock, which defendants failed to disclose. *Id.* at 608.

Although the court ultimately found that genuine issues of material fact precluded summary judgment for the defendants, *id.* at 605–06, the *Alabama Farm* court first considered whether the mere failure of the individual defendants to disclose to the Board and the shareholders their "real" motive for adopting the repurchase program, which was allegedly to retain their position of control over AMFI, was actionable under Rule 10b–5. *Id.* at 610. In answering the question in the negative, the court began its analysis with *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 473–74, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977), stating that a breach of fiduciary duty by corporate officers without any manipulation, deception, misrepresentation or omission does not violate the statute or Rule 10 b–5 but is actionable solely under state law. *Id.* at 608, 610. Applying *Santa Fe*, the *Alabama Farm* court held that the failure of a corporate official to disclose his motives in entering a transaction is not actionable. *Id.* at 610.

The *Alabama Farm* court reasoned that Section 10(b) and Rule 10b–5 were "pro-

---

**2.** *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir.1981) (en banc) (adopting as binding precedent all of the decisions of the for-

mer Fifth Circuit handed down prior to the close of business on September 30, 1981).

mulgated to prevent fraudulent practices in securities trading and trading on inside information. They were not intended to require, under normal circumstances, the disclosure of an individual's motives or subjective beliefs, or his deductions reached from publicly available information." *Id.* (citation omitted). As long as the "facts" of the transaction—the nature, size, and scope of the stock repurchase plan—are adequately disclosed, the mere nondisclosure of the "motive" for the transaction is not actionable. *See id.*

The allegations of *Alabama Farm*, however, presented more than the mere non-disclosure of motive. In that case, the court found that the evidence raised genuine issues of material facts as to whether the repurchase program there, as intended and carried out, was a manipulative device to inflate artificially the market price. *Id.* at 611–16. The defendants allegedly carried out the repurchase plan to boost the market price because the defendants wanted to discourage others from purchasing shares or attempting to gain control of AMFI. *Id.* There was evidence of steady buying by AMFI, purchases at inflated prices, deterioration of AMFI's policyholder surplus, a letter from the Florida Department of Insurance directing AMFI to cease repurchases, a possible impact on AMFI's ability to write new business, and the suspicious timing of the repurchase program in conjunction with the incurrence of taxes. *Id.* at 615–16. Under those circumstances, the court found that the evidence presented genuine issues of material fact as to whether the stock repurchase program was a manipulative device and whether the nondisclosure of defendants' scheme, including their entrenchment motive, constituted deception within the meaning of Section 10(b) and Rule 10b–5. *Id.*

*Alabama Farm* teaches that in the absence of allegations demonstrating that an entrenchment motive is part and parcel of a manipulative device or deceptive scheme, and where the size and scope of a transaction is adequately disclosed, the nondisclosure of motive is not actionable. *See also Ward*, 854 F.2d at 791–92 ("The plaintiffs cite no cases in which an entrenchment motive alone is held actionable, and thus Charge 17 is clearly improper. Although impure deeds or omissions that enable defendants to implement a plan are said ... to constitute actionable "facts," no such deeds or omissions are alleged in Charge 5. Standing alone, Charge 5 is also flawed."); *Vaughn v. Teledyne, Inc.*, 628 F.2d 1214, 1220 (9th Cir.1980) (stating that it is not a violation of any securities law to have a plan to make a stock acquisition to obtain control unless "the plan includes practices that are intended to mislead or to defraud investors").

In the case at bar, it is undisputed that the size and scope of the repurchase plan were adequately disclosed to the public when it was adopted and throughout its implementation. Moreover, Plaintiffs fail to allege that the stock repurchase plan included fraudulent practices intended to mislead or defraud investors. *See infra* Section III.A.3. Accordingly, the mere failure of the Individual Defendants to disclose the ADT Board's alleged motivation in adopting the share repurchase program is not actionable.

Plaintiffs argue that *Alabama Farm* is distinguishable because in this case Defendants mischaracterized the rationale for the stock repurchase plan. At the July 31, 2003 Conference Call, Defendant Gursahaney announced the debt increase and new target leverage ratio of 3 times debt to EBITDA and stated "[w]e expect to use

proceeds from incremental leverage to pursue a flexible, balanced capital allocation plan on an ongoing basis, including investing in organic growth, completing acquisitions, and returning capital to shareholders in the form of dividends and share buybacks." (Compl. ¶ 85.) When specifically asked for the rationale for the increase, Defendant Gursahaney stated only that the extra debt would be "optimal" for business growth and acquisition strategy. (*Id.*)

However, Defendants' alleged mischaracterization of the rationale for the stock repurchase plan is not actionable for the same reason the nondisclosure of motive is not actionable. Although Defendants did not characterize the stock repurchase plan as Plaintiff would have characterized it, Plaintiffs are not complaining about the absence of any facts about the size and scope of the underlying stock repurchase plan. Defendants' motives and subjective beliefs and deductions from publicly available information are not actionable. *See Alabama Farm*, 606 F.2d at 610; *Golub*, 576 F.2d at 759 (finding that defendants' mischaracterization of the bonus aspect of the sale, which allegedly was not compensation for services but a premium for their willingness to make the sale, was not actionable). As stated by the district court in *Stedman v. Storer* and often repeated:

> The unclean heart of a director is not actionable, whether or not it is "disclosed," unless the impurities are translated into actionable deeds or omissions both objective and external. If the underlying facts are fairly stated, subjective motivations need not be disclosed. This is not to say that management never has the duty to disclose subjective motivations; if such a duty exists, it exists under state law—not under federal securities law.

308 F.Supp. 881, 887 (S.D.N.Y.1969). In any event, corporate control is recognized to be of universal interest to corporate officers and directors, such that failure to disclose this subjective interest is not a violation of securities laws. *Rodman v. Grant Foundation*, 608 F.2d 64, 71 (2d Cir.1979).

Because nondisclosure of Defendants' alleged improper entrenchment motive is not actionable, the Court easily concludes that nondisclosure of the Corvex Defendants' underlying "threats" is likewise not actionable. The only purported relevance of the Corvex Defendants' alleged threats is to raise the specter that the ADT Board approved the stock repurchase program for an improper motive, i.e. to accede to the Corvex Defendants' demands in order to remain on the Board. Since Plaintiffs are not entitled to disclosure of an improper motive, Plaintiffs were not entitled to disclosure of the underlying threats, which are rendered immaterial thereby.

Before concluding, the Court would be remiss not to point out that Defendants' alleged hidden entrenchment motivation is based upon mere conjecture. In the Complaint Plaintiffs allege that the Board's "real concern was not the best interests of Plaintiffs and the Class, but in securing their positions." (Compl. ¶ 89.) But the asserted basis for that allegation is a presentation made by Credit Suisse to the Board, which contained the views of a third-party, not the Board. The Complaint contains other conclusory allegations suggesting that the Board recognized that it would need to give Defendants "exactly what they wanted" to "avoid risking their ... positions," (*see e.g.*, Compl. ¶¶ 89, 97) ("execute Meister's demands"), but those allegations appear to be copied from the allegations in the Complaint in the parallel

derivative action, Case No. 15–80570–WPD. There is no factual support for Plaintiffs' conclusory and speculative allegations in this Complaint or the derivative Complaint that Defendants actually harbored a hidden entrenchment motivation when they approved the share repurchase program and then later increased the leverage ratio in July 2013.

The only real "threat" made by the Corvex Defendants to the ADT Board that they actually might unseat the ADT Board, which is identified in the Complaint, was the one the ADT Board received by way of Goldman Sachs and Centerview Partners in late August 2013, whereby the Corvex Defendants proposed an accelerated timeframe for increasing leverage. In September 2013, the Individual Defendants received from Goldman Sachs and Centerview Partners a "Situation Update" on demands by Corvex. According to the update, in late August 2013, Corvex proposed an accelerated timeframe for increasing net leverage to 3.0x, instead of management's July plans to increase gradually leverage to 3.0x by Q1 2015 and to allocate capital more heavily to mergers and acquisitions. (*Id.* ¶ 101.) The materials indicated that if the leverage timeframe was not adopted, Corvex would present a Public LBO and run a competing slate of directors. (*Id.* ¶ 102.) However, at the time of the Corvex Defendants' proposal in late August 2013, the ADT Board had already adopted a share purchase program and had already announced an increase in the share repurchase program from $2 billion to $3 billion. Plaintiffs cannot use the late August 2013 demand to impugn the Individual Defendants' earlier decisions and statements. Moreover, there are no particularized allegations in the Complaint demonstrating that the Defendants made any decisions or statements subsequent to the late August 2013 demand that were inconsistent with the Board's existing July 2013 plans to increase leverage over time.

In summary, the Court concludes that Defendants' nondisclosure of an entrenchment motivation in entering into the stock repurchase plan, their alleged mischaracterization of the rationale behind stock repurchase program, and their nondisclosure of the Corvex Defendants' underlying threats are not actionable, because Defendants adequately disclosed the size and scope of the repurchase plan and the undisclosed information is not part of a manipulative device or deceptive scheme to defraud. Furthermore, the alleged entrenchment motivation is purely speculative and not supported by the factual allegations of the Complaint.

### ii. Leverage Plans

Plaintiffs contend that Defendants understated their plans to increase leverage throughout the Class Period in public filings and conference calls. In particular, at the November 2013 Conference Call, Defendant Mikells stated that "I would just reiterate that in looking at our leverage target, we are certainly confident that it is going to enable us to maintain investment and investment grade rating. And ultimately that something were [sic] going to continue to manage to. (*Id.* ¶ 127.) Defendant Gursahaney commented on ADT's "commitment to maintain an investment grade rating" and targeted leverage ratio of "about 2 times." (*Id.* ¶ 126.) Defendant Gursahaney stated that he did not see a major departure from what was contemplated prior to the spin-off. (*Id.*) During the January 30, 2013 Conference Call, Defendant Mikells stated, in response to a question about the reason ADT was not

buying back more shares,[3] "we are executing exactly what we intended and said we were going to execute and I think we are fairly far along in the program for the year and that is very consistent with the overall capital structure and capital allocation that we talked about at the end of November." (*Id.* ¶ 150.) In the May 1, 2013 Conference Call, regarding the funding of share repurchases, Defendant Gursahaney stated "[a]nything we do at this stage is going to be consistent with the $2 billion three-year share purchase program that we announced back in November." An analyst directed an inquiry to Defendant Gursahaney, stating, "[o]kay, but based on that, it doesn't sound like you're anticipating at this point raising incremental debt to fund share purchase. It sounds like you have plenty of excess liquidity at this point to do what you want to do." In response, Defendant Gursahaney stated, "I think we have liquidity at this point and we are at our target leverage. So again I think we are sticking to what we laid out back in November." (*Id.* ¶ 173.)

 It is not plausible that these statements could be considered false or misleading based upon the allegations of the Complaint. There are no allegations in the Complaint suggesting that at the time of these conference calls—in November 2012, January 2013, and May 2013, ADT had already decided to increase leverage. The mere fact that the Corvex Defendants endorsed increased incremental leverage and made those views known to the Board in November and December 2012 does not suggest that ADT or the Board adopted those views prior to July 2013, when ADT announced its decision to increase leverage.

Based upon the allegations of the Complaint, there is no doubt that the Corvex Defendants wanted the ADT Board to adopt a stock repurchase plan. On October 24, 2012, Defendant Meister, speaking on behalf of Corvex, made a 50–slide presentation to investors, arguing that ADT was undervalued and should use increased leverage to repurchase 30% of ADT's shares. (*Id.* ¶ 83.) Defendant Meister publicly criticized ADT's conservative approach to debt and referred to ADT's capital structure as "indefensible." (*Id.* ¶ 83.) The next day, ADT issued a press release, acknowledging that it has had "constructive discussions with Defendant Corvex and others to understand their views." (*Id.* ¶ 84.) During a meeting between Defendant Corvex and certain members of ADT's Board, Defendant Meister stated that he was interested in joining the ADT Board and again conveyed Defendant Corvex's view that "ADT could enhance shareholder value through the incurrence of incremental leverage." (*Id.* ¶ 85.)

Plaintiffs' allegations, however, do not make it plausible that Defendants had decided to increase leverage at the time of the November 2012, January 2013, and May 2013 conference calls. At the Board's December 2012 meetings, the ADT Board reviewed a presentation made by Credit Suisse that speculated that Corvex would take certain actions if ADT did not agree to Meister's capital structure changes and offer him a Board seat. (*Id.* ¶ 89.) Credit Suisse surmised that Corvex would "likely" seek to add or replace directors and change management and warned the Board that it was "vulnerable." (*Id.*) A presentation by Lazard revealed that the Board "knew it would need to fully or

---

**3.** There is no indication in the Complaint that as of January 30, 2013, ADT was not on track

to fulfill its existing stock repurchase plan it announced in November 2012.

partially implement Corvex's capital structure and capital allocation proposals by increasing leverage" and that some "additional capitulation" to substantiate a Corvex claim of "victory" (*Id.* (brackets and internal quotation markets omitted).) However, the Complaint does not allege how presentations made by independent third parties, Credit Suisse and Lazard, could plausibly provide a sufficient factual predicate for determining the Board's thought-processes and plans on whether and when to increase leverage.

Finally, during the Conference Call in May 2013, Defendant Gursahaney discussed only ADT's liquidity in present terms without foreclosing the possibility of an increase in leverage at some point in the future. (*Id.* ¶ 173.) He assured the market that "at th[at] point" ADT was not planning on increasing leverage. Defendant Gursahaney did not give any assurances or suggestion that ADT would not change its plans in the future, or that it had closed all doors to Corvex's proposal to increase leverage, which was public knowledge as a result of Corvex's October 2012 SEC filing. For these reasons, even accepting Plaintiffs' allegations as true, the Court cannot conclude that Defendants' statements could mislead a reasonable investor with regard to ADT's position on liquidity and leverage.

### b. Operational Issues

The crux of Plaintiffs' Complaint regarding operational issues is not that Defendants denied the existence of ADT's operational problems. Indeed, as Plaintiffs acknowledge, the Complaint is littered with public disclosures acknowledging the existence of new competition, increased attrition, elevated subscriber acquisition costs, new customer service programs, new customer screening requirements, and

the like. Rather, the basis of Plaintiffs' complaint is more nuanced. Plaintiffs' claim of falsity rests almost entirely upon Defendants' misstatements and omissions concerning the magnitude of the cause and effect of the operational problems. For example, while Defendants disclosed that loss to competition accounted for 10% of attrition during the Class Period, Plaintiffs argue they understated its damaging effect. While Defendants acknowledged that the increase in subscriber acquisition costs was partly due to the emergence of new competition, Plaintiffs claim they understated the effect of competition on the increase in the costs. As a result, to state a plausible claim based upon their theory of falsity, Plaintiffs must necessarily allege adequate facts demonstrating the actual magnitude of these operational problems to rebut Defendants' statements. This, Plaintiffs failed to do. There are insufficient allegations in the Complaint to demonstrate that more than 10% of attrition was attributed to competition or that the majority of SAC was not attributable to Pulse, or that the customer service mishaps and overly aggressive sales practices were more than isolated problems. As more fully disclosed below, Plaintiffs have failed to state a plausible claim of falsity as to the alleged operational problems.

#### i. Customer Service/Attrition

#### 1. November 27, 2012 Conference Call

 Plaintiffs' allegations fail to demonstrate that Defendant Mikells' statement about mitigating attrition during the November 27, 2012 conference call was false or misleading. According to Plaintiffs, Mikells stated during the conference call that ADT was implementing "successful" programs, including "improved customer service," to "help to mitigate otherwise pres-

sure against attrition." (*Id.* ¶ 128; DE 80 at 10.) Plaintiffs contend that this statement was false because while Defendant Mikells was "touting" ADT's attention to customer service and the effectiveness of programs to fix customer service problems (Compl. ¶¶ 62, 65), in actuality ADT's subpar customer serve and its efforts to improve customer service were failing to quell customer attrition. (Compl. ¶¶ 62, 66–67.)

However, the actual content of Mikells' statement was quite different from what Plaintiffs alleged in the Complaint. Specifically, Mikells stated:

> Naren specifically spoke to relocations and looking to put better programs in place in retaining our customers. And, certainly, everything we can do to both improve customer service and to ensure that customers are fully utilizing their systems and getting the value out of those systems, we think can help to mitigate otherwise pressure against attrition.

(Ex. 68–1 at 11.) Mikells was not "touting" the success of ADT's customer service and its programs when she made this statement, as Plaintiffs allege (Compl. ¶¶ 62, 65), nor was she denying the existence of pressure on attrition or suggesting that customer service programs were already decreasing attrition. Mikells simply stated that ADT was putting "better" programs in place to "improve" customer service, which she thought would help to counteract pressure on attrition. There are no allegations in the Complaint suggesting that ADT was not implementing programs to retain customers in November 2012. Further, no reasonable investor reading Mikells' statement would be led to believe that ADT's customer service was free of all problems relating to billing,

monitoring, and equipment, or that the customer service programs being put in place had already mitigated attrition. Indeed, the statement suggests just the opposite. If ADT's customer service were problem-free and attrition had already been stemmed, then the programs would have been unnecessary.

Even if Defendant Mikells' statement could be read as "touting" ADT's customer service programs and their effectiveness in mitigating attrition as of November 2012, the Court cannot conclude that the Complaint alleges a plausible claim of falsity. None of the confidential witnesses address the effectiveness of any customer service programs on attrition in or around November 2012. Although CW3 alleged that ADT created a Customer Loyalty Desk in 2013 that was "not very effective" and was a "joke," there are no allegations in the Complaint concerning the effectiveness of any customer service programs on attrition when Defendant Mikells made her statement. (*Id.* ¶ 62.) Instead, Plaintiffs more generally allege that at the time, customer service was subpar, and it was common that customers were cancelling their service. In support of those allegations, Plaintiffs primarily point to the testimony of the three CWs–CW3, CW4, and CW6, each of whom worked at ADT during the time preceding Mikells' November conference call. (DE 80 at 16.) However, as discussed in detail below, none of these confidential witnesses specifically address the magnitude of the customer service problem or overall attrition in or before November 2012, when Defendant Mikells' statement was made.

None of the confidential witnesses (CW3, CW4, or CW6) specify how common the customer service problems were or how many customers cancelled due to the

problems. CW6 alleged that during telephone calls, "sometimes" customers would become upset about billing problems and "some" customers would become angry when the police did not respond to the ADT dispatcher due to the lack of a permit, but the Complaint does not allege how many customers called or cancelled. (Compl. ¶¶ 59, 61.) CW3 and CW4 vaguely allege it was "common" or "often," respectively, customers cancelled because their homes were not being monitored due to faulty equipment or unspecified mistakes, but do not quantify the problem. (*Id.* ¶ 60.)

The confidential witnesses also fail to identify the timing and geographic scope of their observations of poor customer service. For example, while CW3 makes the conclusory statement that the level of customer care decreased and stated that the time period between the "end of 2012" and when he left ADT in early 2014 was the "apex of the worst problems at ADT," CW3 does not specify whether the customer service problems he observed occurred prior to November 2012 or on a national scale (as opposed to the residences covered by the local office in West Palm Beach, Florida). (*Id.* ¶ 63; *id.* at 16 n.7.)

As to attrition, one confidential witness—CW4—stated that he received reports of customer cancellations in or around November 2012. (Compl. ¶ 45 (stating that during the last year of CW4's employment, i.e. August 2012 to 2013, it was "especially common" that customers canceled their accounts to move to a competitor).). However, neither CW4 nor any other confidential witness specifies the frequency of the cancellations they received (*Id.* ¶ 45 ("especially common," "regularly," and "many").) Even the allegation of CW5, who stated that ADT was "constant-

ly" receiving cancellation requests in 2013 and saw deactivated accounts "all the time" from March 2013 to March 2014 (which, in any event, was after the time Defendant Mikells made her statement), does not provide sufficient factual specificity to demonstrate that ADT understated attrition. (*Id.* ¶ 64.)

In summary, the Court cannot extrapolate, based only on the generalized observations of these lower-level employees, that ADT's overall customer service programs were ineffective at combatting attrition, especially given that ADT served approximately 6.5 million residential and small business customers with approximately 17,000 employees. None of the confidential witnesses specifically address the effectiveness of any customer service programs on attrition in or around November 2012. Moreover, the geographic, quantitative, and temporal scope of the alleged "terrible" customer service problem is not adequately alleged in the Complaint. In conclusion, there are insufficient allegations in the Complaint from which the Court could conclude that Defendant Mikells made a misrepresentation or omission in the November 27, 2012 conference call when she commented on implementing customer service programs to help to mitigate otherwise pressure against attrition.

Like Defendant Mikells, during the November Conference Call, Defendant Gursahaney also commented on programs to address mitigation, stating "we have got a very robust set of programs that we're implementing and continuing to drive to try and mitigate that [attrition] across all areas...." (*Id.* ¶ 128.) Again, while Defendant Gursahaney puffed that the programs were "robust," he did not suggest that the programs had already been suc-

cessful at mitigating attrition, but, rather, that programs were being implemented to mitigate attrition. For the reasons discussed above, the Court concludes that Defendant Gursahaney's statement could not be considered false or misleading.

### 2. 2012, 2013 Form 10–K

In the 2012 Form 10–K and the 2013 Form 10–K, ADT highlighted its "proven track record of successfully balancing" its key business drivers and its ability to use its recurring revenue "to more effectively deliver exceptional service to our customers." (*Id.* ¶¶ 115, 205.) The public filings stated that ADT provides "high quality" service and a "superior customer experience" and puts an emphasis on customer value, which drives customer satisfaction and tenure, decreasing customer attrition and improved profitability. (*Id.* ¶¶ 116, 121, 211.) The 2012 and 2013 Forms 10–K stated that ADT "maintain[s] a service culture aimed at 'Creating Customers for Life.'" (*Id.* ¶ 117–18, 121, 207–08, 211.) In addition, at one conference call, Defendant Gursahaney stated that "our needed customer service investments [are] in place." (*Id.* ¶ 170.)

ADT's statements about its "high quality," "exceptional," and "superior" customer service, as well as its statement about "successfully balancing" business drivers, are not material and therefore not actionable. *See Philadelphia Fin. Mgmt. of San Francisco, LLC v. DJSP Enterprises, Inc.*, 572 Fed.Appx. 713, 716 (11th Cir.2014) (holding that the defendants' statements about the "rigor" of defendant's processes, the "efficiency" and "accuracy" of its operations, and its "effective" staff training were not material); *see SEC v. Merch. Capital, LLC*, 483 F.3d 747, 766 (11th Cir.2007) ("We have said that

"[t]he test for materiality in the securities fraud context is 'whether a reasonable man would attach importance to the fact misrepresented or omitted in determining his course of action.'").

Likewise, the statement that ADT maintains a "service culture aimed at '[c]reating [c]ustomers for [l]ife'" does not "assert specific, verifiable facts that reasonable investors would rely on in deciding whether to buy or sell [ADT's] securities." *DJSP Enterps., Inc.*, 572 Fed.Appx. at 716. Plaintiffs argue that the statement is false because CW7 observed that ADT worked with dealers that did not require background checks or permitted a lower credit score for customers, and three other confidential witnesses (CW3, CW6, CW8) stated that dealers and internal sales representatives made false promises to hook new customers. (Compl. ¶¶ 52–58.) Further, Plaintiffs allege that an unspecified number of ADT customers from unspecified locations complained about billing, monitoring, and equipment issues. (*Id.* ¶¶ 59–61.) However, the aforementioned statement about the "aim" of ADT's service culture is too general to constitute affirmative representations about the creditworthiness of its customers, the credit requirements of its dealers, the honesty of its sales practices, the accuracy of its billing practices, and/or the effectiveness of its equipment and monitoring. In sum, the statement is too general for a reasonable investor to attach importance to it. *See Merch. Capital, LLC*, 483 F.3d at 766; *DJSP Enterps., Inc.*, 572 Fed.Appx. at 716.

Also lacking in specific verifiable facts is Defendant Gursahaney's statement that "our needed customer service investments [are] in place." (*Id.* ¶ 170; *see also* ¶ 191.) Further, the Complaint does not state a

plausible claim of falsity. The confidential witnesses' reports of customer complaints concerning billing, monitoring, and equipment do not sufficiently refute Defendant Gursahaney's general statement that ADT had put customer service investments in place, which were aimed at reducing attrition. For example, there is nothing to suggest that ADT had not made investments in its loyalty desk or upgrading its customers to Pulse. (*Id.* ¶ 191.) Furthermore, the allegation of a single witness that the loyalty desk was "not very effective" and was a "joke" (*id.* ¶ 62), does not sufficiently undermine Defendant Gursahaney's suggestion that the loyalty desk was benefitting attrition.

ii. Competitive Environment/Attrition

1. November 27, 2012 Conference Call

At the November 27, 2012 Conference Call, Defendant Gursahaney observed that there were some new competitors in addition to ADT's traditional competitors with strong capabilities and considerable scale and capitalization but stated that "we feel very good about our positioning capabilities compared to these new competitors." (*Id.* ¶ 125.) Defendant Gursahaney stated that he "d[id]n't see a significant difference in our performance in those markets [where the cable and telco players are in aggregate] versus other markets." (*Id.* ¶ 129.)

 None of the confidential witnesses or board documents draw any kind of a comparison between ADT's performance in markets where the cable and telco players were in the aggregate and its performance in markets where those players were not. The only confidential witness who weighed in on ADT's general performance in the various markets was the Senior Financial Analyst (CW2), who stated that "it was clear that, in *any* market where ADT did have competition, ADT was doing horrible." (*Id.* ¶ 42 (emphasis in original).) Thus, even Plaintiffs' own allegations indicate that Defendant Gursahaney's statement that ADT's performance in the cable/telco markets was not significantly different was accurate.

Likewise, none of the confidential witnesses or the internal Board documents provide a side-by-side comparison of the "positioning capabilities" of ADT to those of its new competitors, Three of the confidential witnesses (CW1, CW3, and CW4) alleged that Comcast and/or AT & T were a concern for ADT because they had "significant resources" and/or their price points were lower than ADT's prices. (*Id.* ¶¶ 41, 44–46.) However, Defendant Gursahaney acknowledged in the same conference call that the new competitors had considerable scale and capitalization. The fact that the new competitors were a concern and offered lower prices does not state a plausible claim as to the falsity of Defendant Gursahaeny's belief in ADT's "positioning capabilities," which, in any event, is corporate puffery, not a fact-laden description.

2. January 30, 2013 Conference Call

At the January 30, 2013 conference, Mikells stated that "from my perspective, the competitive environment really hasn't changed quarter-to-quarter. We are seeing the same level of overall competition. . . . [T]he metrics are holding up very well" *id.* ¶ 150. Defendant Gursahaney stated that ADT was "not seeing any significant change, but clearly it is a dynamic environment. We have got new competitors coming in and we are going to continue to monitor it very closely." (*Id.* ¶ 150.)

■ It is not plausible that these statements were false or misleading based upon the allegations of the Complaint, because there are no allegations in the Complaint to demonstrate that as of January 2013, there had been a quarter-to-quarter or "significant" change in overall competition. While some confidential witnesses allege that competition was internally a growing concern in 2013 and was having a "real impact" on ADT in unspecified ways by mid–2013 (Compl. ¶¶ 41, 42, 44), none of them purport to compare the competitive environment over time—specifically on a quarter-to-quarter basis as of January 2013—so as to make an informed assessment of any overall change in the level of competition. Defendant Gursahaney acknowledged that he would monitor competition closely, indicating that it was a concern for management. Moreover, at least one confidential witness (CW6), who incidentally worked at ADT for the two quarters preceding Defendants' statements, alleged that he "regularly" received deactivation requests due to competition. (Id. ¶ 45.) He did not suggest that he had seen a "significant" or "quarter-to-quarter" increase in competition during that time. The Cash Application Specialist (CW5) testified that there was a "bump in the number" of deactivated accounts in 2013, but he did not allege that he saw an increase in 2012, which is the year that immediately preceded Defendants' statements. (Id.)

Only the Credit Balance Analyst (CW4) alleged that during the last year of his employment, i.e. August 2012 to 2013, it was "especially common" that customers canceled their accounts to move to an unspecified competitor. (Id.) But CW4 does not specify the extent to which the customer cancellations increased, however. In any event, the personal observations a single employee who noticed an increase in cancellations beginning in August 2012 is inadequate to demonstrate the falsity of Defendants' statements. In addition, none of the Board's internal documents concerning competition that are referenced in the Complaint are dated January 2013 or earlier. Given these sparse allegations, the Court cannot conclude that the allegations of the Complaint establish the falsity of Defendants' statements that they did not see a quarter-to-quarter or "significant" increase in competition as of January 2013.

During the same conference call, Defendant Gursahaney observed negative trends in gross customer additions, lead generation, and subscriber acquisition costs, but did not speak to the impact of competition and operational problems on the trends. (Id. ¶ 148.) Plaintiffs allege that Defendant Gursahaney's statements were misleading because he failed to disclose the impact that new competitors were having on these trends. However, none of the allegations made by the confidential witnesses specifically quantify the impact of new competitors or operational woes on customer additions, lead generation, or subscriber acquisition costs in January 2013. Furthermore, none of the Board's internal documents referenced in the Complaint that relate to competition are dated January 2013 or earlier. As a result, the Complaint fails to demonstrate why the statements are false or misleading.

Regarding attrition, Defendant Gursahaney stated that ADT saw some stabilization in attrition and that loss to competition accounts for 10% of disconnects. (Id. ¶¶ 146–47.) Although Plaintiffs contend that this statement was false or misleading, there is no allegation in the Complaint that demonstrates that loss to competition accounts for more than 10% of disconnects.

Although one confidential witness (CW2) alleged that ADT was "doing horrible" in any market where ADT had competition and several other confidential witnesses (CW3, CW4, CW5, and CW6) alleged that an unquantified number of customers cancelled their service to move to a competitor (*Id.* ¶¶ 42, 43, 45), not a single witness alleged what percentage of the Company's cancelling customers were switching to a competitor. The Court cannot consider the truth or falsity of statements regarding the effect of competition on attrition in a vacuum, based only upon an increase in competitor-driven cancellations without consideration of other factors impacting attrition. In summary, the Complaint fails to make a plausible claim that Defendants' statements were falsehoods when they were made.

### 3. May 1, 2013 Conference Call

■■ At the May 1, 2013 conference call, Defendant Gursahaney stated "[n]ew entry competitors continue to have little impact on attrition and in fact, we think the level of concern that has been expressed by some over the past few weeks is overblown.... [W]e attribute less than 10% of our total customer disconnects to lost competition".... We continue to closely monitor the impact ..., but to date nothing has really changed." (*Id.* ¶ 171.)

As stated above, none of the confidential witnesses referenced in the Complaint set forth the percentage of disconnects attributable to competition. Further, although CW3, CW4, CW5, and CW6 noticed increased competitor-driven cancellations, none of them specified whether the increase was attributable to customers moving to a "new entry competitor" as opposed to a traditional competitor. (*Id.*

¶ 45.) The Board's internal documents from its March 13 and 14, 2013 meetings indicate that relocations and non-payments drove the increase in attrition during the second quarter in 2013, not competition. (*Id.* ¶¶ 47, 74.) Indeed, although the ADT Board evaluated ADT's competitive environment at its March 2013 meetings, including pressures on marketing and prospecting and increases in SAC, there is no indication that the Board discussed the new competition's effect on attrition. (*Id.*) Thus, Defendant Gursahaney's public statements about competition were consistent with the ADT's Board's internal documents from its March 13, and 14, 2013 meetings.

### 4. July 31, 2013 Conference Call

In the July 31, 2013 Conference Call, in response to the question whether competition was a factor in the increased attrition, Defendant Gursahaney stated "I would say loss to competition, there hasn't been a significant change there." (*Id.* ¶ 187.) As stated above, neither the confidential witness statements nor the March Board documents support a plausible claim of falsity as to the effect of competition on attrition. In addition, none of the Board's subsequent internal documents, including the documents from the May and July 2013 Board meetings and the June and July 2013 e-mails, specifically address the effect of competition on attrition. While Plaintiffs appear to believe that ADT senior management and board members should have attributed more of the attrition increase to competition, the fact remains that nothing in the Complaint, including the Board's internal documents, shows that the loss to competition accounts for more than 10% of attrition.[4]

### 5. November 20, 2013 Conference Call

During the November 20, 2013 Conference Call, Defendant Gursahaney stated

---

**4.** Likewise, although Plaintiffs allege that De- fendants should have disclosed the effect of

"[w]e continue to see minimal impact on our business performance, specifically attrition, ARPU, and Pulse take rates, resulting from any new competitors attempting to enter our market." (*Id.* ¶ 217.) Defendant Gursahaney stated that ADT's two-channel (direct and dealer) approach "provides us significant competitive advantage and has allowed us to add more than 1 million new customers each year for the past four years." (*Id.* ¶ 219.) Neither of the statements made by Defendant Gursahaney could be considered false or misleading in light of the allegations of the Complaint. First, as discussed above, none of the allegations of the Complaint attempt to quantify the effect that competition was having on attrition, average revenue per user, and Pulse take rates, much less contradict Defendant Gursahaney's statement. Although the Board internally expressed concern over the effect of competition on costs, Defendant Gursahaney's statement specifically relates to only three metrics, not including costs. In making a report about competition, Defendant Gursahaney had no concomitant obligation to reveal a detailed picture of every aspect of the company's operations on which competition could possibly bear. *FindWhat*, 658 F.3d at 1306 ("Under the Plaintiffs' preferred rule, company reports of revenue growth—no matter how factually accurate and no matter the level of generality—would be made at the company's peril, carrying a concomitant obligation to reveal a detailed picture of every aspect of the company's operations that could possibly bear on future revenue. This is not the rule."). Defendant Gursahaney expressly limited his statement to three metrics, and no allegations of the Complaint demonstrate the content was false.

Second, the allegations of the Complaint do not contradict Defendant Gursahaney's statement that ADT's two-channel approach allows ADT to add more than 1 million new customers each year, and his commentary that its approach provides "significant competitive advantage" is the type of corporate puffery that is not actionable. Accordingly, Plaintiffs have not alleged a plausible claim of falsity.

6. December 6, 2013 Investor Day

Finally, during the December 6, 2013 Investor Day Conference, Defendant Gursahaney stated "[t]he [market] share story hasn't changed much. Despite some M & A activity and some entrants, ADT is the clear market share leader in this space with six times the scale of our next largest competitor." (*Id.* ¶ 229.) Defendant Gursahaney stated "[i]n the aggregate, the cable market—cable players only have less than 1% of the market today. So it's not a huge impact on the business, and again ADT has some tremendous advantages." (*Id.*) Although the Complaint alleges that competition was a real concern, there are no allegations in the Complaint that contradict the market share numbers disclosed by Defendant Gursahaney. Accordingly, the Court cannot conclude that the statements could be considered false or misleading based upon the allegations of the Complaint.

iii. Customer Acquisition/Credit Screening

■ The 2012 and 2013 Forms 10–K stated that ADT has "[a] structured customer acquisition process that is designed to produce customers with attractive characteristics, including strong credit scores and high usage of automated payment

competition on additions and costs-to-serve, there is nothing in the Complaint that demonstrates the actual effect that those items had on competition.

methods, which we believe results in long average customer tenure." (*Id.* ¶ 117–18, 121, 207–08, 211.) Regarding ADT's customer acquisition process, there are insufficient allegations in the Complaint to demonstrate that ADT's statement was false or misleading.

One confidential witness (CW7) opined that ADT partnered with certain dealers that did not require background checks or permitted a lower credit score for customers. (*Id.* ¶ 53.) CW7 did not provide any details regarding the screening processes used by these dealers or the actual credit scores allowed by the dealers. CW7 did not quantify the number of dealers that permitted a lower score, or, more importantly, the number of customers who had lower credit scores as a percentage of ADT's total customers. CW7 did not state whether the partnership with these dealers was a company-wide policy or where any such policy was implemented.

The limited insight offered by CW7 does not contradict ADT's statement that it had a structured customer acquisition process designed to produce creditworthy customers. Further, none of the Board's internal documents suggest that ADT's customer acquisition process was not structured or not designed to produce creditworthy customers. Although ADT opted to implement an enhanced credit screening process to reduce non-pay disconnects in 2014, which was disclosed at Investor Day according to Defendants, that fact does not establish that the acquisition process that was already in place was not designed to produce attractive customers. For all of these reasons, the Court cannot determine that ADT's statement regarding its "structured" customer acquisition process in its public filings was false or misleading.

#### iv. Sales Practices

■ The Forms 10–K commented that ADT uses "a highly structured sales approach, which includes ... weekly monitoring of sales activity," and "train[s] and monitor[s] each dealer to ensure ... high-quality sales and installation methods." (*Id.* ¶¶ 120–21; 210–11.) ADT stated that "[a]uthorized dealers are required to adhere to the same high quality standards for sales and installation as company-owned field offices." (*Id.* ¶¶ 120, 210.) ADT also referred to its field sales force as "robust." (*E.g.,* ¶ 119.)

Some of Defendants' statements constitute mere puffery, such as its "robust" sales force. *See Philadelphia Fin. Mgmt. of San Francisco, LLC v. DJSP Enterprises, Inc.,* 572 Fed.Appx. 713, 716 (11th Cir.2014) (holding that the defendants' statements about the "rigor" of defendant's processes, the "efficiency" and "accuracy" of its operations, and its "effective" staff training were not material). As to Defendants' other statements regarding its standards, methods, training, and monitoring, while Defendants' statements may imply that ADT had programs in place that would detect significant or grave problems in dealer sales practices and installation, *see FindWhat,* 658 F.3d at 1298–99 (stating that Defendants' statements triggered a duty to disclose the grave defects that existed within the enforcement system they voluntarily touted), the Complaint does not allege the extent of the alleged problems in ADT's dealer's sales and installation tactics, much less a "grave" one. Instead, two employees (CW6 and CW8) alleged that an unspecified number of dealers made promises they did not keep, and a third employee (CW3), who worked out of an office in West Palm Beach, Florida, said that customers complained about dealers and he thought they did "shoddy" work and sold bad equipment. (*Id.* ¶¶ 54–55, 57.)

Although CW8 vaguely stated that dealers were a "constant issue," and CW6 com-

mented that he received a "high volume" of calls from "many" new customers who felt that they received false promises, such as free equipment and lower rates, from internal and outside sales personnel (*Id.* ¶¶ 54, 57), neither actually quantified the scope of the problem. Further, neither CW6 nor CW8 allege that the false promises had any effect on ADT's financials, since there is no allegation that the customers actually discontinued their service due to the unfulfilled promises. Certainly, having touted their sales program, Defendants had a duty to disclose grave defects that existed within that program. *See FindWhat,* 658 F.3d at 1298–99. But the law does not impose a duty to disclose every slip-up and misstep, however immaterial, within a touted sales program.

### v. Costs [5]

◼ The Court does not find a plausible claim of falsehood as to Defendant Gursahaney's statement at the July 31, 2013 Conference Call, with regard to the pressure due to the emergence of new competitors, that "*I would say SAC has gone up* but *most* of our SAC increase is the result of the Pulse take rates as well as the Pulse upgrades*," when asked about pressure from the emergence of new competitors. (*Id.* ¶ 189 (emphasis added).) Although the March Board meeting documents indicate that "[p]ulse take rates *and* competitive environment [were] driving subscriber acquisition costs up" (*Id.* ¶ 74 (emphasis added)), nothing in the Com-

plaint suggests that most of the fault for the SAC increase was not Pulse take rates. In fact, none of the allegations of the Complaint demonstrate how much of the SAC increase was attributable to competition. Defendant Gursahaney did not deny that competition was partly responsible for the increase in SAC. In fact, he acknowledged that SAC had increased due to the emergence of new competitors.

A defendant has a duty to neutralize only the "natural and normal implication" of its statements. *FindWhat,* 658 F.3d at 1305–06. Defendant Gursahaney's statement did not imply or give the false impression that no other factors, including competitive environment, were attributable to the SAC increase. So long as a corporation's statements are not misleading, the law does not impose a duty on a corporation to reveal every factor impacting a corporation's costs. There is no contradiction between that statement and the allegations of the Complaint, including internal Company documents, and therefore the Court cannot conclude that the statement could be considered false or misleading.

According to the Complaint, during the November 20, 2013 Conference Call, Defendant Gursahaney stated that per-subscriber acquisition costs in the direct sales channel were up 15.9% versus last year, but blamed it on increased costs in connection with Pulse. (*Id.* ¶ 220.) However, the actual transcript of the call states that

---

**5.** Of course, any of Defendants' statements about subscriber acquisition costs made *before* the March 2013 board meeting could not be considered false or misleading based upon the internal documents and issues discussed at those meetings. (*See* Compl. ¶¶ 130, 148.) Furthermore, Defendants' numerous vague statements about cost control and cost management lack sufficient factual specificity to

mislead a reasonable investor about the extent of the impact of competition on subscriber acquisition costs. Plaintiffs have also failed to allege a plausible claim of falsity as to "cost-to-serve" expenses, which are not specifically addressed in the Board's internal documents or by the confidential witnesses, relative to competition.

Defendant Gursahaney also stated, in the next sentence, that "[o]verall, Pulse accounted for the *majority* of the increase in direct channel SAC." (DE 66–1 at 283 (emphasis added).) Later in the Conference Call, an analysis asked, "But what are you seeing as far as related to your SAC and competition, I mean, are you having to do anything or you are just really not seeing anything and these guys are just really not a threat really at all?" (Id. at 287.) In response, Defendant Gursahaney stated:

> Well, again, the *biggest* driver of our SAC is the increase in Pulse takes rates. Pulse definitely has a higher SAC but also a significantly higher ARPU and now, we believe, better retention characteristics. So the returns are very attractive. And then also the Pulse upgrades and remember we report SAC on a per customer basis. When we go do an upgrade, we get all of that cost in the numerator, but we don't get an incremental unit in the denominator. So that does distort a little bit the SAC per customer, *and that's about 350 basis points of the year-over-year increase.* So, Pulse is really the *primary* driver of the SAC increase, and we feel good about making that incremental investment based on the returns we expect to get from those customers.

(*Id.* (emphasis added).)

Like his statement at the July 2013 Conference Call, Defendant Gursahaney's statement did not imply or give the false impression that no other factors, including competitive environment, were attributable to the SAC increase. He merely commented that Pulse was the primary driver of the SAC increase. Moreover, Defendant Gursahaney's statement in November 2013 is entirely consistent with his e-mail

to certain officers and directors the previous month, wherein he stated: "Pulse take rates and Pulse upgrades *that increased subscriber acquisition costs.*" (Compl. ¶ 81 (emphasis in original).) As a result, the Court cannot conclude that Plaintiffs have stated a plausible claim of falsity.

### vi. Touted Financial Results

Finally, Plaintiffs argue that in public filings, press releases, and conference calls, Defendants' touted financial results were misleading because Defendants failed to disclose the poor customer service and unscrupulous sales practices. However, requiring Defendants to reveal isolated operational problems alongside the Company's financial results would be impractical and outside the requirements of the securities law. As stated by the Eleventh Circuit, "[r]equiring that disclosures be complete and accurate does not mean that by revealing one fact about a product, one must reveal all others that, too, would be interesting, market-wise." *FindWhat,* 658 F.3d at 1305 (citation, alterations, and ellipsis omitted). Moreover, as discussed in detail above, there are insufficient allegations showing that the isolated customer service and sales problems identified by the confidential witnesses were a company-wide problem.

Further, the allegations of the Complaint demonstrate that Defendants did acknowledge the effects of competition on attrition and subscriber acquisition costs in its public filings, conference calls, and press releases. (Compl. ¶ 147 ("loss to competition accounts for the remaining 10% of the total [attrition]")); ¶ 189 ("I would say SAC has gone up [a result of pressure with the emergence of new competitors] . . ."). Although Plaintiffs insist that Defendants understated the effect on attrition and subscriber acquisition costs,

there are no allegations showing that competition attributed to more than 10% of attrition or that the effect on SAC was greater than claimed.[6]

c. Forward–Looking Statements

Plaintiffs make the conclusory statement in the Complaint that ADT did not have a reasonable basis for its financial forecasts. (Compl. ¶¶ 135(f), 154(f), 176(f), 199(g), 238(g), and 254(g).) Aside from the absence of any allegations showing that the financial forecasts in the Complaint are false or misleading, the forecasts were forward-looking statements accompanied by meaningful cautionary statements and therefore are not actionable. See 15 U.S.C. ¶ 78u–5(c)(1)(A)(i). Alternatively, the forward-looking statements are not actionable because there are insufficient allegations that they were made with actual knowledge of their alleged falsity.

2. Scienter [7]

Section 10(b) and Rule 10b–5 require a showing of either an "intent to deceive, manipulate, or defraud," or "severe recklessness." *Mizzaro v. Home Depot, Inc.,* 544 F.3d 1230, 1238 (11th Cir.2008). "Severe recklessness" is a term reserved for those highly unreasonable omissions or misrepresentations that involve "extreme departure" from the standards of ordinary care and that present a danger of misleading buyers or sellers which is either known to the defendant or is "so obvious" that the defendant must have been aware of it. *Id.*

 The PSLRA raised the standard for pleading scienter in a securities fraud action. Specifically, "the complaint shall, with respect to each act or omission alleged to violate this chapter, *state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.* 15 U.S.C. § 78u–4(b)(2) (emphasis added). A "strong inference" of scienter means an inference that is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 324, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007). In making the scienter inquiry, "courts must consider the complaint in its entirety," counting any omissions and ambiguities in the complaint against an inference of scienter. *Id.* at 322, 326, 127 S.Ct. 2499. The inquiry is "inherently comparative" because courts "must take into account plausible opposing inferences." *Id.* at 323, 127 S.Ct. 2499.

a. Defendant Gursahaney

i. No Actual Knowledge

 "Where a defendant publishes a statement at a time he is in possession of or has access to facts suggesting that the statement is inaccurate, misleadingly, or incomplete ... a classic fact pattern giving rise to a strong inference of scienter appears." *In re Sensormatic Elecs. Corp. Sec. Litig.,* No. 018346CIVHURLEY, 2002 WL 1352427, at *6 (S.D.Fla. June 10, 2002). Plaintiffs contend that Defendant Gursahaney had actual knowledge of the effect of competition, customer service

---

6. Because the Court concludes that the Complaint does not state a claim of falsity as to any of the Defendants, the Court need not decide whether Defendant Mikells could be held liable for the statements made by Defendant Gursahaney or whether Defendant Meis-
ter could be held liable for the statements made in the 2013 Form 10–K.

7. Because the Court has found that the individual Defendants lack scienter, it follows that scienter is not properly imputed to the corporation, ADT.

problems, and improper sales practices on customer additions, attrition, and costs, as well as the "true" reason behind the stock repurchase plan, based upon detailed confidential witness accounts and Board meetings and correspondence.

### 1. Confidential Witness Accounts

Plaintiffs allege that the accounts of the confidential witnesses demonstrate that Defendant Gursahaney was directly confronted with ADT operational problems at town hall meetings, which he attended. According to the former District of Product Management (CW1), competition and attrition were topics discussed at town hall meetings and Defendant Gursahaney would "always" attend these meetings. (Compl. ¶ 67.) CW1 further stated that attrition was one of the "biggest" issues emphasized by executive leadership between April 2013 to April 2014. Likewise, the former Customer Service Unit Manager (CW8) reported that attrition rates were discussed at quarterly town hall meetings held via teleconference, which were led by Defendant Gursahaney or a vice president. (*Id.*) The Senior Financial Analyst (CW2) stated that in mid–2003, Defendant Gursahaney was "obsessed with competition because ADT's competitors were eating its lunch in market-share." (*Id.* ¶ 42.) However, the Complaint fails to assert particularized allegations regarding the actual content of these discussions in which Defendant Gursahaney participated regarding attrition and competition. District courts within the Eleventh Circuit have repeatedly held that confidential witness allegations, to be accorded much weight, must "flesh out at least some of the details of the conversations, meetings, and internal documents that they describe." *Mogensen v. Body Cent. Corp.*, 15 F.Supp.3d 1191, 1219–20 (M.D.Fla.2014).

The allegations of the Complaint pertaining to Defendant Gursahaney's attendance at town hall meetings are too vague for this Court to infer that Defendant Gursahaney acted with scienter in making false public disclosures, and Plaintiffs fail to allege how CW2 arrived at the conclusory statement that Defendant Gursahaney was "obsessed with competition."

### 2. Internal Board Documents and Correspondence

Plaintiffs assert that Defendant Gursahaney had actual knowledge of the alleged falsehoods because he attended Board meetings and authored communications wherein attrition and competition were discussed. It is true that the topics of attrition and competition were discussed at Board meetings and in e-mails sent by Defendant Gursahaney. (Compl. ¶¶ 47, 74, 75, 77–81.) The Board and/or e-mails discussed a growing attrition trend, "increased competition" in the marketplace, and the effect of competition on (1) marketing and (2) subscriber acquisition costs. (*Id.* ¶¶ 47, 74.) Specifically, the Board discussed that marketing by ADT's competitors was diluting ADT's share of marketing voice, and that Pulse take rates and the competitive market were increasing SAC. (*Id.*) The Board also discussed that the increase in attrition was driven by relocations and nonpayment. (*Id.*) However, that Defendant Gursahaney was directly confronted with a growing attrition trend and increased competition in the marketplace does not establish that he had actual knowledge of, or access to, information rebutting his statements that loss to competition accounted for less than ten (10) percent of attrition; that ADT was "the clear market share leader in this space with six times the scale of our next largest competitor"; or that "[i]n the ag-

gregate, the cable market—cable players only have less than 1% of the market today". (*Id.* ¶¶ 146–47, 171, 229.) Defendant Gursahaney was also not confronted with · information that suggested the change in, and/or the effect of, the competitive environment was "significant"; that disparaged ADT's "positioning capabilities" as compared to those of its new competitors; or that suggested there was a "significant difference" in ADT's performance in markets where the new cable and telco competitors were present. (*Id.* ¶¶ 125, 129, 148, 150, 187–88, 217.) Likewise, although Defendant Gursahaney was presented with financial information that showed that the competitive market was increasing SAC, he was not presented with information that contradicted his public statement that Pulse take rates were the primary driver of the escalation. (*Id.* ¶ 189.)

As to the stock repurchase plan, the Complaint does not allege that Defendant Gursahaney was confronted with actual threats made by the Corvex Defendants. Although Credit Suisse and Lazard speculated as to what actions Corvex would take if ADT did not agree to Meister's capital structure changes and offer him a Board seat and/or made recommendations as to how the ADT Board should proceed based upon those hypotheses, the Complaint does not allege that the Corvex Defendants actually threatened to remove the ADT Board members if they did not accede to their demands. The "threats" alleged in the Complaint are hypothetical ones based upon mere conjecture.

As discussed above, the Board's alleged hidden entrenchment motivation is also based upon mere conjecture. In the Com-

plaint Plaintiffs allege that the Board's "real concern was not the best interests of Plaintiffs and the Class, but in securing their positions." (Compl. ¶ 89.) But the asserted basis for that allegation is the Credit Suisse presentation to the Board, which, as discussed above, contained the views of a third party, not the Board. The Complaint contains other conclusory allegations suggesting that the Board recognized that it would need to give Defendants "exactly what they wanted" to "avoid risking their ... positions," (*see e.g.,* Compl. ¶¶ 89, 97) ("execute Meister's demands"), but those allegations were simply copied from the allegations in the Complaint in the derivative action. There are no allegations suggesting that Defendant Gursahaney was confronted with information suggesting that the Board harbored a hidden entrenchment motivation when it adopted the share repurchase program.

In conclusion, the Complaint does not support an inference of scienter based upon Plaintiffs' contention that Defendant Gursahaney had possession of, or access to information about ADT's operational problems [8] or the true reason behind its stock repurchase plan.

### ii. No Presumed Knowledge

■ Plaintiffs also argue that since the confidential witnesses were aware of the effects of competition and operational problems and/or due to Defendants' high-ranking positions and their knowledge of core operations, *a fortiori,* Defendants "should have been known" of the problems. However, as to the first rationale, there are insufficient facts showing that the allegedly undisclosed effects of competition and the "terrible" operational

---

**8.** Plaintiffs failed to demonstrate that Defendant Gursahaney was directly confronted

with any information about improper sales tactics or customer service problems.

problems perceived by the confidential witnesses percolated up to senior management.

First, as to competition, the confidential witnesses do not allege that the impact of competition on ADT's key drivers was so quantitatively and geographically significant that ADT's officers and directors must have known about its significant impact. None of the confidential witnesses attempt to quantify the effect of competition from new entrants. While CW1 alleges that Comcast and AT & T were "formidable competitors," CW2 alleges that by mid–2013 competition was having a "real impact" and ADT was "doing horrible," and CW3 alleges that ADT was in a "state of panic" in early 2013 (Compl. ¶¶ 41, 42, 44), those allegations are far too vague for the Court to infer that competition was having a large enough effect on attrition and additions that senior management must have known about it. *Mizzaro*, 544 F.3d at 1251 (11th Cir.2008) (refusing to infer that the fraud was so large that any senior executive either knew about it or was severely reckless in not discovering it, where the complaint lacked a reasonable basis for calculation of the total amount of fraud).

There are few specifics offered by the confidential witnesses concerning the effects of competition. CW6, who was a Customer Service Representative with ADT for a little over one year, from July 2012 to November 2013, at a call center in Irving, Texas, where a total of 300400 employees worked, said he "regularly" received deactivation requests because competitors were offering a lower price. (Compl. at 17 n.10 & ¶ 45.) He handled 65–70 calls per day from residential and small business customers. (*Id.*) It would be impossible to derive from CW6's vague testimony, even when considered in conjunction with the number of daily calls he handled, a meaningful calculation as to the extent of the effects of competition from new entrants.

The only confidential witnesses who arguably commented that there was an increase in attrition based upon competition are the Credit Balance Analyst (CW4) and Cash Application Specialist (CW5), but their allegations are also vague. CW4 alleged that during the last year of his employment, i.e. August 2012 to 2013, it was "especially common" that customers canceled their accounts to move to an unspecified competitor. (*Id.* ¶ 45.) But CW4 also asserted that it was "common" that customers canceled because they found out that their residence was not actually being monitored, and the Complaint does not disclose the geographic demographics of CW4's customers. (*Id.* ¶ 60.) CW5 testified that in 2013, there was a "bump in the number" of deactivated accounts because many customers were switching over to competitors. (*Id.* ¶ 45.) There is no basis in the Complaint, however, for inferring the number of customers who make up that "bump," let alone inferring from CW5's "bump" allegation that senior management must have known that loss to competition from new entrants amounted to more than 10% of attrition and that the change in competition was "significant."

Second, the allegations concerning customer service and sales tactics suffer from the same problem: lack of specificity regarding the scope of the problem. None of the confidential witnesses (CW3, CW4, or CW6) specify how common the customer service problems were or many customers cancelled due to the problems. CW6 alleged that during telephone calls, "sometimes customers would become upset"

about billing problems and other customers would become "very angry" when the police did not respond to the ADT dispatcher due to the lack of a permit, but he did not allege that the disgruntled customers cancelled. (*Id.* ¶¶ 59, 61.) Plaintiffs do not address how Defendants could possibly know about the existence of disgruntled customers when there was no alleged effect on the Company's key drivers. CW3 and CW4 vaguely allege it was "common" or "often," respectively, customers cancelled because their homes were not being monitored due to faulty equipment or unspecified mistakes, but do not quantify the problem. (*Id.* ¶ 60.) CW3 also alleged that ADT's Customer Loyalty Desk was "not very effective" and was a "joke," but provides no basis for making this generalized statement about an entire department that "would work with customers that were upset and had major issues with ADT." (*Id.* ¶ 62.) Again, these vague allegations from lower-level employees are insufficient to infer the knowledge of Defendant Gursahaney about ADT's alleged company-wide customer service problems.

Likewise, with respect to the sales practices, none of the confidential witnesses (CW3, CW6, or CW8) specify how common the false promises were or many customers complained about shoddy work or bad equipment. Furthermore, although CW6 and CW8 stated that dealers were a "constant issue," and that there was a "high volume" of calls from "many" new customers who felt that they received false sales promises (*Id.* ¶¶ 54, 57), neither CW6 nor CW8 allege that the false promises had any effect on ADT's financials, including attrition. Moreover, there is no allegation in the Complaint suggesting that the unfulfilled promises or bad equipment emanated from a company-wide policy from senior management. Rather than alleging some basis upon which Defendant Gursahaney could have become aware of the alleged sales problems, the Complaint alleges that Defendant Gursahaney viewed ADT's authorized dealers as the "backbone" of ADT and took the top representatives from every major dealer on a one-week excursion. (*Id.* ¶ 56.)

Finally, Plaintiffs' mere allegations that Defendants held senior management positions, had access to inside information, and therefore must have known of the falsity of certain statements is insufficient to plead scienter. *In re Smith Gardner Sec. Litig.,* 214 F.Supp.2d 1291, 1303 (S.D.Fla.2002). The alleged fraud in this case relates to matters—the encroaching effect of competition, the declining quality of frontline services and sales, hypothetical threats by a corporate raider, and the collective consciousness of a board in entering a transaction—that evade ready detection. *See Mizzaro,* 544 F.3d at 1230 (finding that the complaint did not raise a strong inference of scienter where the alleged fraud would be difficult for senior management to detect because there were no "red flags" in the company's financial statements). Unlike "red flags" in a financial statement, or the launch of a federal safety investigation, *see In re ValuJet, Inc.,* 984 F.Supp. 1472, 1480 (N.D.Ga.1997) ("The Plaintiffs' complaint is replete with allegations detailing the Defendants' knowledge of the safety and maintenance problems and the FAA investigation at the same time the Defendants were making representations in press releases and the 1995 Form 10–K regarding ValuJet's safety and plans for growth."), the alleged effects of competition, changes in customer service, and unarticulated threats by a corporate raider would not have been easy to detect.

Regarding competition, as Defendant Gursahaney stated, "it's been a little tough

to tell th[e] [impact of the cable and the telco players] story at time [sic] because the realty [sic] is most of these new entrants don't report their numbers. You see their ads but we don't know how many new accounts they've gotten everything." (*Id.* ¶ 230.) Regarding customer service and sales problems, unless Defendant Gursahaney actually took the calls on his own, he would not have known about the allegations of false promises, billing inaccuracies, and permit issues, which are not alleged to have culminated in cancellations. (*Id.* ¶¶ 54, 57, 59, 61.) Regarding the demands made by Defendant Meister, the alleged "threats" were largely the product of speculation by third parties, i.e. Lazard and Credit Suisse. (*Id.* ¶ 89.) Likewise, the alleged internal motivation of a Board in entering into a transaction is also a product of Plaintiffs' speculation. As a result of the difficulty in detecting the fraud, Defendant Gursahaney's mere involvement in the day-to-day affairs of the Company does not support a strong support of scienter.

### iii. Alternative Inferences

 Plaintiffs do not allege that Defendant Gursahaney engaged in any suspiciously-timed stock sales. The fact that he did not sell the stock at inflated prices means he stood to lose money if the value of ADT's stock fell. *See Mizzaro,* 544 F.3d at 1253 ("[T]he amended complaint says nothing about suspicious stock transactions by any of the individual defendants, an omission that weighs against inferring scienter."). Instead of selling stock, ADT bought its own stock during the relevant period. "[S]tock repurchase programs actually *negate* a finding of scienter." *Plumbers & Pipefitters Local Union 7119 Pension Fund v. Zimmer Holdings, Inc.,* 673 F.Supp.2d 718, 749

(S.D.Ind.2009) (citation omitted, emphasis in original), *aff'd,* 679 F.3d 952 (7th Cir. 2012); *see also McNamara v. Pre–Paid Legal Servs., Inc.,* 189 Fed.Appx. 702, 718 (10th Cir.2006) (holding that the complaint insufficiently pled scienter because it was "lacking in allegations demonstrating [ ][d]efendants' alleged fraud was economically logical in light of [the company's] repurchase of its own stock at allegedly inflated prices" and failed to allege that the accounting violations were the result of an intent to mislead investors). Further, Plaintiffs do not allege any financial restatements, auditor resignations, or violations of accounting standards. While none of these indicators is required to allege scienter, their absence weighs against inferring scienter.

Further, the allegations of the Complaint reveal that ADT made a plethora of public disclosures about the existence of competition during the Class Period, acknowledged that it would continue to watch competition because it was dynamic, and reported accurate financial figures for additions, attrition, and costs. Similarly, ADT fully disclosed the size and scope of the repurchase program as it developed and acknowledged its consideration of the Corvex Defendants' views on capital structure in public filings. Defendants were careful in their public filings not to foreclose the possibility that ADT would expand its stock repurchase plan. Defendants' repeated public cautionary statements and disclosures would make little sense if Defendants had a plan to deceive the public on these very issues.

Finally, as discussed above, the Court finds that Plaintiffs' allegations that Defendant Gursahaney harbored a hidden entrenchment motivation are conclusory and based upon mere speculation. For all

these reasons, the Court concludes that Plaintiffs have not pled a cogent inference of scienter.

### b. Defendant Mikells

Plaintiffs allege that as CFO, Defendant Mikells is presumed to have known about the effects of competition, attrition, and customer service on the Company's financial condition and the share repurchase program during her tenure. It is true that Defendant Mikells made statements about competition, attrition, customer service, as well as the share repurchase program at conference calls. Nevertheless, as discussed in detail above, the alleged fraud in this case would not have been difficult for senior management to detect. *See Mizzaro*, 544 F.3d at 1230 (finding that the complaint did not raise a strong inference of scienter where the magnitude of alleged fraud was not alleged and the type of alleged fraud would be difficult for senior management to detect). In addition, as also discussed in detail above, there are insufficient facts showing that the alleged operational problems perceived by the confidential witnesses percolated up to senior management. That rationale applies with particular force as to Defendant Mikells, who resigned on May 2, 2013. While nearly all of Defendant Mikells' public statements concerned the Company's operational and financial affairs in 2012 (with the exception of the May 1, 2013 Form 10–Q) (*e.g.*, ¶¶ 128, 149, 150), nearly all of the confidential witnesses spoke about problems that existed in 2013 (or failed to specify the timing of the problems). (*Id.* ¶¶ 4144, 46–62, 64–72.)

 Plaintiffs allege that Defendant Mikells' "abrupt" resignation as the Com-

pany's CFO on May 2, 2013, also adds to the inference of scienter.[9] There are two fatal weaknesses in their argument, however. First, the Complaint does not adequately allege any suspicious circumstances surrounding the resignation. While Plaintiffs allege that Defendants' scheme began to unravel just three months later when ADT increased financial leverage, the Complaint alleges that the truth of the fraud was not fully revealed until nine months later, on January 30, 2014. (*Id.* ¶ 239.) Second, Plaintiffs' theory that Defendant Mikells resigned before the unraveling of the fraud conflicts with their "motive and opportunity" allegation that Defendant Mikells adopted Defendant Meister's share repurchase program to keep her position at the Company. Absent more sufficient allegations, the Court cannot draw an inference of scienter from Defendant Mikells' resignation. *See Chiarenza v. IBSG Int'l, Inc.*, No. 09–22736–CIV, 2010 WL 3463304, at *7 (S.D.Fla. Sept. 2, 2010) ("Birch's resignation, without more specific facts as to Birch's knowledge, is not enough to establish scienter.").

Far from "cogent," Plaintiffs' claim of scienter is built upon inconsistencies and illogic. Given the fact that Defendant Mikells did not sell ADT stock at inflated prices, as well as the absence of allegations showing financial restatements, auditor resignations, or violations of accounting standards, it is a far more cogent inference that Defendant Mikells did not make the allegedly false statements with scienter.

### c. Defendant Meister

As stated above, because the alleged fraud in this case, including the "hidden"

---

**9.** Although not necessary to the Court's resolution of the issue, the Court notes that Defendant Mikells stated in her brief that upon her resignation, she became CFO at Xerox.

motivation of the other Board members, would not have been easily detected by Defendant Meister and there are insufficient facts showing that the alleged operational problems perceived by the confidential witnesses percolated up to outside directors, the Court cannot conclude that Defendant Meister should be presumed to know of the fraud. *See Mizzaro*, 544 F.3d at 1230 (finding that the complaint did not raise a strong inference of scienter where the magnitude of alleged fraud was not alleged and the type of alleged fraud would be difficult for senior management to detect). The Court's conclusion has special application to Defendant Meister because he was an outside director and the Complaint does not allege that he was involved in the day-to-day affairs of the Company. *In re Shengda-Tech, Inc. Sec. Litig.*, No. 11 CIV.1918 LGS, 2014 WL 3928606, at *10 (S.D.N.Y. Aug. 12, 2014) ("[O]utside directors are almost by definition excluded from the day-to-day management of a corporation, unless by virtue of their status or a special relationship with the corporation, they have access to information more akin to a corporate insider.").

As to motive allegations, the Complaint alleges that Defendant Corvex sold nearly all of its ADT shares back to ADT in November 2013 at artificially inflated prices. In actuality, as alleged in the Complaint, Defendant Corvex sold the shares at market price pursuant to a private agreement between ADT and Corvex. Although Defendant Meister was privy to inside information as an ADT Director at the time of the sale, there is no allegation that all eight non-Corvex Defendants, who approved the share repurchase, timed the sale so that the Corvex Defendants would maximize their returns on nonpublic information. In addition, the sale of Corvex's stock occurred in conjunction with Defendant Meister's departure from the ADT Board and as an alleged activist shareholder. When viewed in its totality, including the stock sale, the Court cannot find that the allegations demonstrate a strong inference of scienter as to the Corvex Defendants.

### 3. Scheme Liability [10]

Section 10(b) of the Securities Exchange Act makes it unlawful for any person, directly or indirectly, through interstate commerce to use or employ, in connection with the purchase or sale of any security "any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j. The SEC, pursuant to this section, promulgated Rule 10b–5, which makes it unlawful:

---

**10.** Although Defendants ADT, Gursahaney, and Mikells did not specifically argue that the allegations of the Complaint do not state a plausible claim of scheme liability, they argued that the Complaint does not state a strong inference of scienter, which is an element that equally applies to claims premised upon mere deceptive conduct. *See Stoneridge Inv. Partners, LLC v. Scientific–Atlanta*, 552 U.S. 148, 158, 128 S.Ct. 761, 169 L.Ed.2d 627 (2008). Therefore, the Court finds that dismissal of the Complaint as to scheme liability applies with equal force to the claims brought against ADT, Gursahaney, and Mikells. In addition, the Court notes that the allegations of the Complaint, as pled, do not purport to state a claim of scheme liability, but rather attempt to state a claim of false or misleading statements and omissions. The scheme liability claim was raised by Plaintiffs in response to the Corvex Defendants' Motion to Dismiss. The Court does not expect Defendants ADT, Gursahaney, and Mikells to brief a claim that was raised for the first time by Plaintiffs in their response to the other Defendants' motion to dismiss.

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 CFR § 240.10b–5. Section 10(b) liability does not extend to aiders and abettors. *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164, 191, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994). Nevertheless, Plaintiffs contend that the conduct of Defendants ADT, Mikells, and Gursahaney, and the Corvex Defendants qualify as deceptive conduct under Section 10(b) and Rule 10b–5(a) and(c).

In a typical § 10(b) private action, a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *Stoneridge Inv. Partners, LLC v. Scientific–Atlanta,* 552 U.S. 148, 157, 128 S.Ct. 761, 169 L.Ed.2d 627 (2008). In *Stoneridge,* the Supreme Court opined that "[c]onduct itself can be deceptive," and, therefore, a plaintiff can state a § 10(b) private action based upon deceptive con-

duct even in the absence of a misrepresentation or omission, as long as the other elements of liability are met. *Id.* at 158, 128 S.Ct. 761.

■ In this case, Plaintiffs fail to allege that Defendants engaged in deceptive conduct other than the making of alleged misrepresentations and omissions. As stated above, the law in this circuit is that the failure of corporate directors and officers to disclose their true motivations in adopting a share repurchase program does not constitute "deception" within the meaning of Rule 10b–5. *Alabama Farm Bureau Mutual Casualty Co. Inc. v. American Fidelity Life Ins. Co.,* 606 F.2d 602 (5th Cir.1979). However, a defendant may be held liable under § 10(b) where there was a scheme to maintain corporate control at the cost of inflating stock prices or the effect of the repurchase plan, as carried out, was to inflate the price of the stock. *Id.* at 616.

■ The allegations of this Complaint do not allege that Defendants engaged in a deceptive scheme with the purpose or at the cost of inflating stock prices. Whereas in *Alabama Farm,* there was evidence that the defendants actively manipulated the stock market price as a means to gain control over the corporation, there is no allegation here that Defendants carried out the repurchase plan to artificially inflate the price of ADT's stock.[11] As alleged in the instant Complaint, the Corvex Defendants carried out the repurchase plan to enhance shareholder value, and the ADT Board allegedly carried out the re-

---

11. As stated in *Alabama Farm,* "any person having rudimentary knowledge of securities trading would realize that a course of purchasing stock would tend either to increase the price of the stock or to avert a decline in price that might otherwise occur." 606 F.2d at 611. However, the law makes a scheme actionable only when the complaint asserts a "scheme *artificially* to manipulate the market and *artificially* (that is, beyond the operation of normal market factors) to inflate prices." *Id.* There is no such scheme alleged here.

purchase plan to remain entrenched in their positions, which alone is not actionable. It is not alleged that any of Defendants used and manipulated *the stock market* as a means to obtain corporate control.

Based upon the Court's review of the Complaint, the facts surrounding the repurchase plan are as follows: (1) on October 24, 2012, Meister, on behalf of Corvex, made a public presentation to investors that advocated a capital repurchase program to enhance shareholder value, Compl. ¶ 83; (2) Corvex acquired 5% of ADT's outstanding common stock; (3) on October 25, 2012, Corvex filed with the SEC a Schedule 13D announcing that it had acquired over 5% of ADT's outstanding common stock, *id.* ¶ 84; (4) on November 26, 2012, Meister stated to certain members of ADT's Board and management that he was interested in joining the board and that Defendant Corvex believed that ADT could enhance shareholder value through the incurrence of incremental leverage, *id.* ¶ 85, and soon thereafter, ADT adopted a $2 billion share repurchase plan; (5) in December 2012, the ADT Board listened to presentations from third parties, who speculated on how the Corvex Defendants might execute on their desire for ADT to adopt a share repurchase plan, and on December 17, 2012, Meister was appointed to ADT's Board, *id.* ¶ 90, and was also appointed as a member of the Board's Audit Committee, *id.* ¶ 92; (6) in July 2013, ADT increased its target leverage ratio, and in late August 2013, Defendant Corvex proposed to ADT an accelerated timeframe for increasing leverage as a condition to Meister's exit from the board, and the use of debt proceeds to repurchase shares; Corvex threatened the ADT Board that if the leverage timeframe was not adopted, Corvex would present an alternative capital allocation framework

and run a competing slate of directors to be voted on at ADT's 2014 AGM, *id.* ¶¶ 101–02; and (7) in November 24, 2013, Corvex entered into an agreement with ADT whereby ADT would repurchase 10.24 million shares of ADT common stock held by Corvex at a purchase price of $44.01 per share. There is no allegation of manipulation of the stock price or other deceptive conduct as a means of achieving the alleged scheme.

Further, as was the case in *Stoneridge,* the allegedly deceptive acts of Defendants in this case "which were not disclosed to the investing public, [we]re too remote to satisfy the requirement of reliance." 552 U.S. at 161, 128 S.Ct. 761. As in *Stoneridge,* this Court finds that a "[d]ifferent interpretation of [Defendants' argument] is that the [defendants] w[ere] stating only that any deceptive statement or act [they] made was not actionable because it did not have the requisite proximate relation to the investors' harm." *Id.* at 158–59, 128 S.Ct. 761. In *Stoneridge,* plaintiffs asserted § 10(b) claims against Charter Communications, Inc., a cable operator, as well as two companies that supplied equipment to the cable operator (the "suppliers"), among other defendants. Although the suppliers agreed to enter into transactions with Charter that had no economic substance, which enabled Charter to inflate its revenues on financial statements, the suppliers had no role in preparing the cable company's financial statements. As a result, the Supreme Court held that the plaintiffs could not prove that the investing public relied upon the suppliers' deception. *Id.* The Court explained:

[T]heir deceptive acts were not communicated to the public. No member of the investing public had knowledge, either actual or presumed, of respondents'

deceptive acts during the relevant times. Petitioner, as a result, cannot show reliance upon any of respondents' actions except in an indirect chain that we find too remote for liability.

*Id.* at 159, 128 S.Ct. 761.

Here, as in *Stoneridge,* the allegedly deceptive acts were not communicated to the public. Plaintiffs repeatedly allege throughout the Complaint that Defendants had an undisclosed plan to remain entrenched in their positions. Indeed, Plaintiffs base the bulk of their Complaint on Defendants' failure to disclose their entrenchment motivation to the public. As a result, Plaintiffs cannot show that the investing public had knowledge of the allegedly deceptive acts or reliance thereupon. In addition, the Court notes that the allegations of the Complaint do not establish a strong inference of scienter, which also applies to a scheme liability claim. *Stoneridge,* 552 U.S. at 158, 128 S.Ct. 761. For these reasons, the Court concludes that the Complaint fails to state a viable claim based upon "scheme liability" against Defendants.

**B. Section 20(a) Claim**

Under Section 20(a) of the Exchange Act, to state a claim for controlling person liability against a defendant, it must be alleged that the defendant had (1) the power to control the general affairs of the entity primarily liable for the Section 10(b) or Rule 10b–5 violation at the time of the violation, and (2) the power to control or influence the specific policy that resulted in the primary violation under Section 10(b) or Rule 10b–5. *In re Unicapital Corp. Sec. Litig.,* 149 F.Supp.2d 1353, 1367 (S.D.Fla.2001) (citing *Brown v. Enstar Group, Inc.,* 84 F.3d 393, 396 (11th Cir. 1996)). Here, because Plaintiffs have failed to plead a primary violation under Section 10(b) or Rule 10b–5 of the Exchange Act, the Section 20(a) controlling persons claim must also be dismissed. *Theoharous v. Fong,* 256 F.3d 1219, 1227 (11th Cir.2001).

**IV. CONCLUSION**

For the foregoing reasons, it is hereby **ORDERED AND ADJUDGED** that Defendants' Motions to Dismiss (DE .66, 67, 68) are **GRANTED.** The Amended Complaint (DE 60) is **DISMISSED.** Plaintiffs are granted leave to file an amended complaint on or before July 1, 2015, consistent with the dictates of this Order. Failure to file an amended complaint by the deadline may result in dismissal of this action with prejudice.

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward County, Florida, this 3rd day of June 2015.